644 So.2d 1235 (1994)
David W. DUPLANTIS
v.
STATE of Mississippi.
No. 91-DP-01220.
Supreme Court of Mississippi.
October 27, 1994.
*1237 Dannye L. Hunter, Jackson, for appellant.
Michael C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
PRATHER, Presiding Justice, for the Court:

I. INTRODUCTION AND PROCEDURAL HISTORY
In June 1991, twenty-three year old David Duplantis, along with K.C. Strickland, was *1238 arrested for the murder of Gary Thrash. The Newton County Grand Jury subsequently indicted Duplantis and Strickland for murder in the commission of a robbery in violation of Miss. Code Ann. § 97-3-19(2)(e). Duplantis was also indicted as an habitual offender pursuant to Miss. Code Ann. § 99-19-81. Severance and a change of venue were granted Strickland; Duplantis' motion for change of venue was denied. In December 1991, Duplantis was found guilty by a jury, adjudicated an habitual offender, and sentenced to death. Following denial of his motion for new trial Duplantis appealed to this Court, seeking review of the following issues:

PRE-TRIAL ISSUES
A. Whether the trial court's refusal to grant funds for independent experts to assist the defense violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections Fourteen, Twenty-six, and Twenty-eight of Article Three of the Mississippi Constitution.
B. Whether the trial court's denial of a change of venue violated Duplantis' right to a fair trial under the Mississippi and United States Constitutions.
C. Whether Duplantis' statement and waiver of extradition should have been suppressed because obtained in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections fourteen and twenty-six of Article Three of the Mississippi Constitution.
D. Whether the trial court's denial of Duplantis' motion for continuance was error which deprived him of his right to counsel, due process, and a fair trial under the United States and Mississippi Constitutions.
E. Whether the trial judge's excusing of venire members and moving of venire members to the end of the jury selection list, without cause or explanation, violated the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding Sections of the Mississippi Constitution.
F. Whether the trial court's voir dire of prospective jurors regarding their ability to impose the death sentence was inadequate to reveal bias in favor of the death penalty.
G. Whether the trial court's refusal to allow counsel to voir dire jurors regarding their attitudes toward the death penalty violated Duplantis' rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections Fourteen, Twenty-six, and Twenty-eight of Article Three of the Mississippi Constitution.
H. Whether striking venire members Ronnie Estes and Bobby Nichols for cause was justified or was in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Section Twenty-six of Article Three of the Mississippi Constitution.
I. Whether the trial court's refusal to remove for cause numerous jurors with relationships biased against Duplantis violated his right to an impartial jury and to a fair trial under the Mississippi and United States Constitutions.
J. Whether the State exercised peremptory challenges to remove African- and Native-Americans from the jury in violation of the Fourteenth Amendment of the United States Constitution and Sections Fourteen and Twenty-six of Article Three of the Mississippi Constitution.

GUILT PHASE ISSUES
K. Whether the trial court erred in admitting evidence and argument of other crimes and wrongs in violation of the Mississippi Constitution, laws, and rules of evidence, and of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.
L. Whether the introduction of inflammatory photographs of the victim without evidentiary purpose or probative value violated the Fourteenth Amendment to the United States Constitution, the Mississippi Constitution, and Mississippi law.
*1239 M. Whether opinion testimony of Ron Smith failed to meet the standard for expert testimony and was therefore inadmissible and violative of Duplantis' Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution and corresponding sections of the Mississippi Constitution.
N. Whether the State's failure to make timely discovery available to Duplantis violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, corresponding sections of the Mississippi Constitution, and Mississippi Uniform Criminal Rule of Circuit Court Practice 4.06.
O. Whether Duplantis' requests for lesser offense instructions were denied by the trial court in violation of Mississippi law and the Mississippi and Federal Constitutions.
P. Whether instruction S-5 was erroneously granted as it required the jury to acquit Duplantis of the greater charge before it could consider a lesser-included offense, in violation of the State and Federal due process clauses.
Q. Whether the prosecutor's comments in closing argument violated Duplantis' rights under the Federal and Mississippi Constitutions.
R. Whether the trial court's warning that the content of Duplantis' personal closing statement would decide whether the prosecution could attack his failure to testify is error in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and corresponding sections of the Mississippi Constitution.

SENTENCING PHASE ISSUES
S. Whether the trial court's failure to amend sentencing instruction S-1 prevented the jury from having a complete and accurate description of the law on sentencing in violation of Duplantis' rights under the Federal and State Constitutions.
T. Whether the trial court's amendment to sentencing instruction D-92 violated Duplantis' Federal and State Constitutional rights, misinformed the jury on the law, and prevented jurors from properly considering mitigating evidence.
U. Whether the language and form of the verdict are vague and misleading and do not reveal the accurate and thorough deliberation of the jury in sentencing Duplantis to death.
V. Whether failure of the trial court to instruct the jury that Duplantis was adjudicated an habitual offender violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Section Twenty-six of Article Three of the Mississippi Constitution.
W. Whether the prosecutor's comments in closing argument violated Duplantis' rights under the Federal and Mississippi Constitutions.
X. Whether imposition of the death penalty against Duplantis, without sufficient finding or proof of his culpability for the victim's death, violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and corresponding sections of the Mississippi Constitution.
Y. Whether Duplantis' sentence of death is disproportionate.
Issue C, the trial court's failure to suppress Duplantis' statement, requires reversal of both guilt and sentencing phases; therefore, the remaining arguments presented by Duplantis are not addressed unless likely to occur on retrial or if some discussion or explanation is otherwise warranted.

II. THE FACTS
Ken Strickland and David Duplantis escaped from the Lauderdale County Jail on June 14, 1991, and were still at large on June 16, 1991. Ruth Ann Dean, who lived about a quarter of a mile from the house Charlene Thrash rented in Chunky, became concerned when she read in the Meridian Star on June 16, 1991, that the pair had escaped from the *1240 Lauderdale County Jail.[1] Dean's concern was prompted by the fact that Strickland's mother had previously rented the same house now rented by Charlene; Dean called Gary Thrash, Charlene's ex-husband, just after 10:00 a.m. on June 16, a Sunday, and asked him to check on the house.
When Gary Thrash failed to answer his pager on the afternoon of June 16, Robert Strickland, Gary's boss, asked his buddy, off-duty Deputy Sheriff Ron Davis, to accompany him to Charlene's house. Upon arriving at the house Davis and Strickland found a Nissan pickup owner's manual and Gary Thrash's glasses case in the driveway. Davis and Strickland each went to a different side of the house at that point, knocking and calling Gary's name, to no avail. Davis then went back to the rear door of the house, which was unlocked, and started into the house, where he was met by a dog. Davis called to Strickland, who identified the dog as Gary's, and the two men conferred for a moment before Davis entered the house again.
When he entered the house, Davis passed through the kitchen, proceeded into the living room, where he saw no one, and looked into an empty bedroom. Davis continued to a room adjacent to the bathroom and pushed the door open with his foot. As the door came open Davis saw "the body and the blood on the floor there." Startled, Davis backed away and returned to the rear door of the house where Strickland was waiting for him. Davis told Strickland he thought he'd found Gary, but he needed to go back to be sure.
The body was that of Gary Thrash, with a pool of blood about his head and the pockets of his shorts pulled inside out. Davis and Strickland then left the house, secured it, and called for law enforcement and ambulance personnel, the Mississippi Crime Lab, and the coroner. One of the burglar bars in the east window of the bedroom where Gary Thrash's body was found had been cut and bent out, providing access to the house.
Strickland and Duplantis had been in Charlene Thrash's house, as established by fingerprint and other evidence properly admitted at trial. After their stay at the Thrash house, Strickland and Duplantis traveled to Tennessee, where they were arrested by Tennessee authorities on charges unrelated to Gary Thrash's death. Mississippi authorities were then sent to Tennessee to question the pair, at which time Duplantis gave an oral statement regarding Gary Thrash's death.

III. THE LAW

PRE-TRIAL ISSUES

C. Whether Duplantis' statement and waiver of extradition should have been suppressed because obtained in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections fourteen and twenty-six of Article Three of the Mississippi Constitution.

Additional Relevant Facts
Duplantis filed a motion to suppress all confessions or statements of any nature obtained from him by law enforcement officers on the grounds that such statements were not voluntarily made but were induced by promises, making them inadmissible at trial. Duplantis also claimed that the written statement was inadmissible because not signed by him and that all statements obtained from him subsequent to the first were the products of the earlier illegal statement. At the hearing Duplantis argued that both the written statement made in Tennessee, which primarily concerns the crime committed in Tennessee, and the oral statement made in Tennessee, which concerns the death of Gary Thrash, should be suppressed.
Thomas Buntin, a criminal investigator with the Madison County Sheriff's Department in Tennessee, was called as a witness at the suppression hearing. Buntin admitted that Duplantis had refused to talk when first advised of his rights at 10:15 a.m. on June *1241 17.[2] Although Duplantis had advised that he wanted a lawyer present before talking to the authorities, no attempt was made to get him a lawyer because, according to Buntin, Duplantis had not yet been before the judge and it was the judge who would have had to appoint a lawyer. Duplantis was then returned to his jail cell.
Around lunch time Knight, Vick, and Vincent, all Mississippi officers, arrived in Tennessee. Although Duplantis did not initiate or request an interview with the Mississippi authorities, Buntin accompanied Vincent to jail to take Duplantis to the office, where Duplantis and Knight met alone. The Mississippi officers were not advised that Duplantis had previously invoked his right to counsel. At 2:46 p.m. Knight read Duplantis his rights, which Duplantis understood. Knight then read from the waiver, which Duplantis signed without any threats or promises having been made. This waiver was offered as an exhibit. This time Duplantis did not ask for an attorney, but he refused to talk to Knight because he did not know him. Instead, Duplantis said he wanted to talk to Vick, with whom he was acquainted. Vick came into the office shortly thereafter and obliged Duplantis' request to smoke a cigarette in the bathroom, the only place smoking was allowed in the building.
Vick testified that he and Vincent were in the photo and ID room taking pictures of Duplantis' back and hands when Duplantis was Mirandized. Duplantis declined to give a statement. At about 1:30 p.m., Duplantis asked Vick if he would take him to the bathroom to smoke a cigarette. Once in the bathroom, Vick reminded Duplantis that he had been advised of his rights and Duplantis began to talk to Vick about Gary Thrash's death and the escape from the Lauderdale County jail. Vick claimed Duplantis offered to give a formal statement if it could be arranged for him to be moved to Mississippi that day and if he could take a polygraph test regarding a drug charge unrelated to the death of Gary Thrash. Vick promised nothing with regard to the polygraph and explained that although the Mississippi authorities wanted Duplantis in Mississippi, the Tennessee authorities would have to give permission for Duplantis to be moved.[3] No threats or promises were made, and while Vick did not tell Duplantis anything would go easier on him if he told the truth, he did tell Duplantis "it would be better if he told the truth."[4] Vick also explained the charges Duplantis would face in Newton county. Duplantis did not request an attorney, but provided Vick with some of the details of Thrash's death. Vick subsequently contacted the Tennessee District Attorney's office and the Mississippi Attorney General's office about a waiver of extradition. Duplantis signed this waiver and then agreed to talk to Buntin about the Tennessee events.
Mississippi authorities advised Buntin of Duplantis' willingness to talk at about 3:12 p.m. Buntin again advised Duplantis of his rights, which Duplantis waived before agreeing to make a statement. No other officers were present for the execution of this waiver. After Duplantis had given his statement regarding the Tennessee events, Buntin had the statement reduced to writing. Although given an opportunity to make changes to this written statement, Duplantis declined and signed the unchanged statement.
The Tennessee authorities provided Knight and Vick with a copy of the written statement Duplantis had given Sgt. Buntin. This statement, offered as an exhibit, stated that Duplantis had initially advised the Tennessee authorities that he wanted a lawyer present before making a statement, but that he had since decided on his own that he wished to talk. The statement also reads that Duplantis had previously given Mississippi authorities verbal statements of his own free will.
Later that afternoon, somewhere around 4:30 p.m., Knight again had occasion to talk to Duplantis. Mike Vick first read Duplantis his rights, in the presence of Knight and Vincent. Again, Duplantis waived his rights *1242 and signed a form to that effect, without any promises or threats having been made. This waiver was also offered as an exhibit. Duplantis then waived extradition and made a statement to Vick and Knight, which was tape recorded but not taken down in writing.[5] The statement given by Duplantis began with his and Strickland's jail escape, continued through the killing of Gary Thrash, and concluded with the chase, shoot-out, and capture of Duplantis and Strickland in Tennessee.
The trial court found that Duplantis' oral and written statements had been made freely and voluntarily without duress or promises or hope of reward or duress. Duplantis' motion to suppress was overruled. The particulars of Duplantis' oral statement to Vick were admitted at trial through Vick's testimony.

The Parties' Contentions
Duplantis contends that his initial request for an attorney should have prevented further questioning by either Tennessee or Mississippi law enforcement officers. Duplantis also claims that voluntariness alone is insufficient to support a finding of admissibility; there must also be a knowing and intelligent relinquishment of a known right, which is lacking in his particular case. Duplantis further argues that the trial court failed to apply the law of Edwards v. Arizona[6] and Minnick v. Mississippi.[7] Finally, Duplantis claims that his oral statement was obtained in exchange for promises from Mississippi law enforcement officers and that his waiver of extradition was also tainted because officers had not previously respected his request for counsel.
The State attempts to refute Duplantis' right to counsel argument by stating that it was Duplantis who re-initiated conversation with the Mississippi authorities. The State also claims there was no violation of either Edwards or Minnick. Finally, the State argues that Duplantis' waiver of rights was both knowing and intelligent and his statement was freely and voluntarily given. Regarding Duplantis' claim that his waiver of extradition was tainted by a previous illegality, the State correctly notes that Duplantis cited no authority in support of this proposition, that this issue was not presented to the trial court for determination, and that Duplantis has failed to present this Court a record which will allow meaningful review.

Discussion
Regarding Duplantis' claim that his waiver of extradition was tainted by the illegally obtained confession, no authority was cited in support of this proposition, preventing this Court from addressing this issue. Sherrell v. State, 622 So.2d 1233, 1237 (Miss. 1993); Burk v. State, 506 So.2d 993, 993 (Miss. 1987). Duplantis is also barred from raising this issue on appeal because he failed to raise it in the trial court. Jones v. State, 606 So.2d 1051, 1058 (Miss. 1992); Fleming v. State, 604 So.2d 280, 292 (Miss. 1992). Moreover, the record contains no evidence related to Duplantis' extradition or waiver thereof, further preventing any review by this Court.
Custodial interrogation must be preceded by advising the defendant of his right to remain silent and his right to an attorney. Holland v. State, 587 So.2d 848, 855 (Miss. 1991), citing Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). If the defendant invokes his right to remain silent, questioning must cease. Holland, 587 So.2d at 855. If the defendant invokes his right to an attorney, "`the interrogation must cease until [one] is present.'" Id, quoting Miranda, 384 U.S. at 479, 86 S.Ct. at 1630, as quoted in Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378 (1981). Once the defendant has invoked either right, interrogation may resume without an attorney present only if further discussion is initiated *1243 by the defendant and he knowingly and intelligently waives the right previously invoked. Holland, 587 So.2d at 855, citing Smith v. Illinois, 469 U.S. 91, 95, 105 S.Ct. 490, 492-93, 83 L.Ed.2d 488 (1984) (per curiam).
This Court will reverse a trial court's finding that a confession is admissible only when an incorrect legal standard was applied, manifest error was committed, or the decision is contrary to the overwhelming weight of the evidence. Willie v. State, 585 So.2d 660, 665 (Miss. 1991).
Duplantis was taken into custody by the Tennessee authorities and was properly Mirandized. In response, Duplantis invoked his right to remain silent and his right to have an attorney present. The Tennessee authorities returned Duplantis to his cell, but made no attempt to get him a lawyer. When the Mississippi authorities arrived in Tennessee, Duplantis was again Mirandized by Mississippi officers, but without Duplantis' initiation of the interview. Although the State claims this Miranda warning was merely part of the routine processing of Duplantis rather than an attempt to interrogate him, the record does not support this allegation. No witness testified either that Duplantis was Mirandized as part of his routine processing or in an attempt to obtain a statement which would be admissible at trial.[8]
Lacking additional facts, the reasonable conclusion is that the Mississippi officers wished to interrogate Duplantis. As Duplantis had previously requested an attorney, and he had not initiated this conversation with the Mississippi officers, this interrogation constituted a clear violation of Edwards, as alleged by Duplantis.[9]
[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.
Edwards, 451 U.S. at 484, 101 S.Ct. at 1884-85 (footnote omitted). Given Duplantis' prior assertion of his Fifth Amendment right to counsel and the fact that Duplantis remained in continuous custody on the Tennessee charge(s), the authorities should not have interrogated Duplantis about Gary Thrash's death in the absence of counsel unless Duplantis initiated the conversation. Willie, 585 So.2d at 666.
After signing a waiver of his rights, Duplantis declined to answer Officer Knight's questions and asked to talk to Officer Vick instead. The State claims that this is sufficient to find that Duplantis initiated the dialogue which resulted in the formal statement given by Duplantis. Duplantis' request to talk to Vick could arguably be viewed as the suspect's initiation of conversation with officials, but the request to talk to Vick was actually made in response to Knight's warning and questions. In other words, Knight initiated this encounter, then Duplantis re-directed it. This appears to be a case of police perseverance paying off, contrary to the tenets of Edwards.
When Vick arrived on the scene, he again advised Duplantis of his rights and the two retired to the bathroom to smoke a cigarette. Vick testified that while in the bathroom, Duplantis initiated the conversation by trying to strike a deal  he would give a statement in exchange for extradition to Mississippi. Vick told Duplantis that it would be better for him if he told the truth, but didn't tell him anything would be easier for him. Duplantis shared with Vick some of the story regarding Gary Thrash's murder, but Vick said he "didn't ask very many questions at all in terms of detail at that time, because ... we were mainly talking about whether or not *1244 he could go back to Lauderdale County, and I told him that I wanted to get a signed waiver and take a formal statement."
Although Vick claimed Duplantis initiated the conversation in the bathroom, Vick would not have been in the bathroom with Duplantis were it not for Knight's questioning of Duplantis in the first instance. That Duplantis responded to Knight's questioning by asking to talk to Vick instead, and by then attempting to negotiate a deal, does not indicate initiation of the encounter by Duplantis. Vick's admonition that it would be better for Duplantis if he told the truth was not, in the opinion of this Court, an inducement.
Willie, 585 So.2d at 668-69, supports a finding in the instant case that Vick's admonition to Duplantis was not an inducement. Although Duplantis' statement was not a denial, there was no testimony that specific promises were made to Duplantis. In fact, just the opposite is true: Vick testified that he did not promise Duplantis extradition and further testified that he told Duplantis he and the other officers present in Tennessee had no authority to make a deal. Duplantis was a twenty-three year old adult, familiar with the criminal justice system from his prior convictions. There is also no evidence that Duplantis had a personal relationship with any of the officers present in Tennessee, although there is some evidence that he was at least acquainted with Vick. The circumstances surrounding the making of his statement do not suggest that Duplantis was induced by Vick's admonition about telling the truth.
Later that afternoon, Duplantis was again advised of his rights and, in response to questioning by the Mississippi officers, gave a formal statement. Again, dialogue between Duplantis and the officers was initiated by the officers. Since Duplantis invoked his Fifth Amendment right to counsel and the police subsequently initiated conversations in the absence of counsel, all while Duplantis was in continuous custody, any statements made by Duplantis are presumed involuntary. McNeil v. Wisconsin, 501 U.S. 171, 176-77, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158, 167-8 (1991). This is the case despite the fact that Duplantis executed waivers and his statements would, under other circumstances, be considered voluntary. Id.
Although the trial court found that Duplantis' statements were made freely and voluntarily without promises of reward, this is not the correct legal standard for the circumstances presented by the instant case. Id. Moreover, when an accused has invoked his Fifth Amendment right to counsel he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-85, 101 S.Ct. at 1885. This Court accordingly reverses and remands on this issue.

F. Whether the trial court's voir dire of prospective jurors regarding their ability to impose the death sentence was inadequate to reveal bias in favor of the death penalty.

Additional Relevant Facts
The court's questioning of potential jurors concerning their attitudes toward the death penalty consists of the following:
BY THE COURT: My question to you is this: Do any of you have conscientious scruples against the infliction of the death penalty, when the law authorizes the infliction of the death penalty in proper cases, and where testimony of the case warrants the infliction of the death penalty? If you have such conscientious scruples, would you raise your hands, please.
At the conclusion of voir dire by the court, the trial judge stated on the record that the attorneys would not be allowed to get into whether the potential jurors had conscientious scruples against the infliction of the death penalty as the court had already covered that topic. Defense counsel's voir dire of the venire was completed without any objection to the court's previous voir dire or instructions and without any attempt to further address attitudes toward the death penalty.

*1245 Discussion

That those who would automatically impose a life sentence, despite the facts in evidence and the law, should be revealed on voir dire and be excluded from jury service was the pronouncement in Witherspoon v. Illinois, 391 U.S. 510, 522 n. 21, 88 S.Ct. 1770, 1777 n. 21, 20 L.Ed.2d 776, 785 n. 21 (1968). Just the opposite teaching, that those who would automatically impose the death penalty, despite the facts in evidence and the law, may be revealed on voir dire and should be excluded from jury service, was set forth in Morgan v. Illinois, 504 U.S. ___, 112 S.Ct. 2222, 2229-30, 119 L.Ed.2d 492, 502-03 (1992). Thus, the label "reverse-Witherspoon." However, Morgan "provides that it is a violation of a defendant's due process rights to prevent him, in a capital case, from inquiring whether prospective jurors would automatically impose the death penalty upon a conviction." Foster v. State, 639 So.2d 1263, 1273 (Miss. 1994), citing Morgan v. Illinois, 504 U.S. ___, ___, 112 S.Ct. 2222, 2225, 119 L.Ed.2d 492 (1992) (emphasis added).[10]
Duplantis' failure to object to the trial court's voir dire, his failure to request reverse-Witherspoon questioning from the court, and his failure to attempt such a voir dire himself acts to procedurally bar this issue on direct appeal. See Jones v. State, 606 So.2d 1051, 1058 (Miss. 1992); Crenshaw v. State, 520 So.2d 131, 134-35 (Miss. 1988). Moreover, "a party who fails to object to the jury's composition before it is empaneled waives any right to complain thereafter." Myers v. State, 565 So.2d 554, 557 (Miss. 1990). A failure to object at trial waives any error which may have been presented, even in capital cases. Chase v. State, 645 So.2d 829, 859 (Miss. 1994).
This Court has provided guidelines for the circuit courts to follow in conducting Witherspoon voir dire of prospective jurors. Gray v. State, 472 So.2d 409, 421 (Miss. 1985), reversed in part on other grounds, 481 U.S. 648, 668, 107 S.Ct. 2045, 2057, 95 L.Ed.2d 622, 640 (1987), quoting Armstrong v. State, 214 So.2d 589, 593 (Miss. 1968), cert. denied, 395 U.S. 965, 89 S.Ct. 2109, 23 L.Ed.2d 750 (1969). This Court has not yet required the trial court to perform a reverse-Witherspoon voir dire of prospective jurors, nor does Morgan demand this of the trial court. Instead, Morgan found that a defendant is entitled "upon his request, to inquiry discerning those jurors who, even prior to the State's case-in-chief, [have] pre-determined the terminating issue of his trial, that being whether to impose the death penalty." Morgan, 504 U.S. at ___, 112 S.Ct. at 2233, 119 L.Ed.2d at 507. All of the jurors finally seated on Duplantis' jury indicated they could render a verdict based on the law and the facts presented at trial. Even if this issue were not procedurally barred, there would be no error here.

J. Whether the State exercised peremptory challenges to remove African- and Native-Americans from the jury in violation of the Fourteenth Amendment of the United States Constitution and Sections Fourteen and Twenty-six of Article Three of the Mississippi Constitution.

Additional Relevant Facts
Duplantis filed a pre-trial motion requesting that the State be precluded from exercising its peremptory challenges in a discriminatory manner. This motion was overruled. Before the State exercised a single peremptory challenge at voir dire, Duplantis, a white defendant, "invoked" the Batson[11] rule. The State proceeded to excuse nine (9) venire members peremptorily: four (4) Blacks, one (1) thought to be a Choctaw Indian, and four (4) Whites. The jury as seated consisted of nine (9) Whites and three (3) Blacks.
*1246 The trial court required the State to provide non-discriminatory reasons for peremptorily striking Blacks, although it made no determination that Duplantis had made out a prima facie case of discrimination. Regarding one of the challenged jurors, the prosecution stated no reason, "[w]e just wanted to excuse her." "Of course, I think when our selection is viewed as a whole, there won't be a presumption raised." The trial court found that no challenges were executed for racially discriminatory reasons.

Discussion
This issue is addressed only in order that this Court may caution prosecutors to provide race-neutral reasons for the striking of minority venire members when presented with a Batson challenge. Assuming the satisfaction of all other Batson prongs, the State's failure to provide a race-neutral reason for its challenge to a minority venire member would require reversal and remand for a new trial. Goggins v. State, 529 So.2d 649, 652 (Miss. 1988). This Court would also call to the attention of the trial courts the case of J.E.B. v. Alabama, ___ U.S. ___, ___, 114 S.Ct. 1419, 1430, 128 L.Ed.2d 89, 107 (1994), which extends Batson protection to gender.

GUILT PHASE ISSUES

K. Whether the trial court erred in admitting evidence and argument of other crimes and wrongs in violation of the Mississippi Constitution, laws, and rules of evidence, and of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Additional Relevant Facts
Duplantis moved in limine to exclude evidence of other crimes prior to trial. The trial court reserved ruling until such time as contemporaneous objections were made. Evidence of other crimes was mentioned on several occasions and was met with either a contemporaneous objection, no objection, or followed a previously requested continuing objection.
However, the court allowed evidence, over contemporaneous objection, of other crimes on three occasions. First, the trial court allowed evidence of Duplantis' escape from jail because an explanation of prior events was necessary so that the jury would understand the significance of the evidence found at the Thrash house. Second, evidence of the jail escape was allowed over objection because such testimony was necessary to tell the complete story and to aid the jury in its decision making. Here Duplantis requested a continuing objection to evidence of the escape. Finally, although prejudicial, the other crimes evidence (escape, breaking and entering, and larceny) offered was found necessary to avoid jury confusion and speculation. At this point Duplantis again requested a continuing objection. No details of the other crimes were offered and no reference was made to the crimes which occurred in Tennessee, subsequent to the murder.

Discussion
Generally, evidence of a crime other than that charged in the indictment is not admissible evidence against the accused. Willie, 585 So.2d at 679; Ladner v. State, 584 So.2d 743, 758 (Miss. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991); Mackbee v. State, 575 So.2d 16, 23-29 (Miss. 1990). However, where another crime or act is "so interrelated [to the charged crime] as to constitute a single transaction or occurrence or a closely related series of transactions or occurrences," proof of the other crime or act is admissible. Wheeler v. State, 536 So.2d 1347, 1352 (Miss. 1988), citing Neal v. State, 451 So.2d 743, 759 (Miss), cert. denied, 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984). Proof of another crime or act is also admissible where necessary to identify the defendant, to prove motive, or to prove scienter. Wheeler, 536 So.2d at 1352, citing Neal, 451 So.2d at 759.
M.R.E. 404(b) provides:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
*1247 See Hurns v. State, 616 So.2d 313, 321 (Miss. 1993). Admission of evidence of unrelated crimes for the purpose of showing the defendant acted in conformity therewith has repeatedly been found reversible error. Parker v. State, 606 So.2d 1132, 1136 (Miss. 1992), citing Rose v. State, 556 So.2d 728, 731 (Miss. 1990); Houston v. State, 531 So.2d 598, 605 (Miss. 1988).
Case law has often discussed the exceptions under M.R.E. 404(b) and prior practice to an absolute ban on admission of evidence of prior crimes. See Willie v. State, 585 So.2d 660, 678-79 (Miss. 1991) (prior arrest admissible to show defendant's identity and link him to scene of the crime charged); Lockett v. State, 517 So.2d 1317, 1331 (Miss. 1987) (murder of Mrs. Calhoun motivated by desire to successfully escape from murder of Mr. Calhoun, therefore mention of her murder was relevant to establish the unlawful motive in the killing of Mr. Calhoun), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988); Lockett v. State (Lockett II), 517 So.2d 1346, 1355 (Miss. 1987) (other crime directly preceded and led to the crime charged, therefore evidence of the other crime was interrelated and inseparable from the charged crime; exceptions listed in M.R.E. 404(b) not exclusive), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988); Turner v. State, 478 So.2d 300, 301 (Miss. 1985) (other crimes evidence admissible when necessary to tell a rational and coherent story).
Duplantis' failure to object at trial to admission of certain other crimes evidence effectively precludes this Court from reviewing those instances on appeal. Jones v. State, 606 So.2d 1051, 1058 (Miss. 1992). Other instances were preserved for appeal on the basis of a continuing objection. However, as to one of these instances, Duplantis now seeks to assert grounds other than those on which his trial objection was based. It follows that this instance is not reviewable by this Court. See Fleming v. State, 604 So.2d 280, 292 (Miss. 1992), citing Stringer v. State, 279 So.2d 156, 158 (Miss. 1973) ("objection on one or more specific grounds constitutes a waiver of all other grounds"); McGarrh v. State, 249 Miss. 247, 276, 148 So.2d 494, 506 (1963) ("objection cannot be enlarged in reviewing court to embrace omission not complained of at trial"), cert. denied, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963).
Of the instances properly preserved for review by this Court, whether by contemporaneous or continuing objection, Duplantis specifically notes certain testimony of Ruth Ann Dean and Dan Sumrall, which he claims constitutes error. When Ruth Ann Dean was asked what caused her to phone Gary Thrash and ask him to check on Charlene Thrash's house, she stated that she had read in the Meridian Star that Strickland and Duplantis had escaped from the Lauderdale County jail. The trial court overruled Duplantis' objections on grounds of hearsay and irrelevance of other crimes and found that the jury could not understand the turn of events without this explanation, which was part of the res gestae. Don Sumrall, a crime scene investigator who was called to the scene of the crime after Gary Thrash's murder, testified on direct that when he arrived at Charlene Thrash's house he was informed that two men had escaped from the Lauderdale County jail and were under suspicion for Thrash's murder. Duplantis' hearsay objection was overruled without any further comment or explanation by the trial court.
Evidence regarding the escape from jail was necessary to tell a rational and coherent story. Turner, 478 So.2d at 301. Without hearing of the escape, the events which occurred at Charlene Thrash's house would make little sense to the jury  had Strickland and Duplantis not been "on the lam" there would have been little need for them to have been at the house to begin with and even less need for them to have feared discovery. Consequently, evidence of the escape was also properly admitted because relevant to show the motive behind the killing of Gary Thrash. M.R.E. 404(b). Admission of Dean's and Sumrall's testimony that Duplantis had escaped from jail is not error.
When Officer Knight testified to the contents of the statement made by Duplantis regarding the death of Gary Thrash, he related that Strickland and Duplantis had escaped from jail, broken into a stockyard, and stolen some food and the bolt cutters later *1248 identified as the weapon used to murder Gary Thrash. Duplantis objected on the ground that such evidence of other crimes was irrelevant and prejudicial. Again, the trial court overruled the objection and allowed the evidence. The trial judge found that this other crimes evidence would explain to the jury the significance of previous testimony regarding the bolt cutters and food found at the house and prevent speculation. The trial judge was correct; this evidence of other crimes was necessary to tell a complete and rational story and, moreover, connected the defendant to the scene of the crime.
Even where evidence of other crimes is admissible as an exception to M.R.E. 404(b), it can not be admitted if its probative value is substantially outweighed by the risk of undue prejudice. Lesley v. State, 606 So.2d 1084, 1089-90 (Miss. 1992); Hogan v. State, 580 So.2d 1275, 1277 (Miss. 1991). Duplantis' escape from jail, breaking into a stockyard, and stealing food and bolt cutters were probative to explain why he and Strickland were at Charlene Thrash's house and why they feared discovery, i.e., to show the motive for killing Gary Thrash; to show where the murder weapon came from; and to connect Duplantis to the scene of the crime. This is not a case where the other crimes evidence is similar or identical to the crime with which the defendant is currently charged, thereby making it likely that the jury would find him guilty this time simply because he had done it before. Consequently, the risk of unfair prejudice is minimal. The probative value of the other crimes evidence outweighs its prejudicial value and was, therefore, properly admitted by the trial court.
The continuing objection lodged by Duplantis during the questioning of witnesses at trial extends to preserve the alleged errors committed during closing argument; therefore, Duplantis properly preserved several additional instances of other crimes evidence. Each of these instances, however, is a proper comment on the same other crimes evidence as that presented at trial. As the three instances of other crimes evidence discussed above were properly admitted, the prosecutor's comments on such evidence at closing cannot be error.

N. Whether the State's failure to make timely discovery available to Duplantis violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, corresponding sections of the Mississippi Constitution, and Mississippi Uniform Criminal Rule of Circuit Court Practice 4.06.

Additional Relevant Facts
Duplantis gave the Mississippi authorities a written statement on June 17, 1991. A fruitless attempt at tape recording this statement was made. However, Chief Vick later reduced his recollection of the statement to writing. The tape recording, which was inaudible, was not produced by the State until the trial court directed same. The State never attempted to offer the useless tape as evidence.
Regarding Chief Vick's memorandum of Duplantis' statement, Duplantis specifically requested, on September 25, 1991, any written summations or paraphrases of the substance of any oral statements. The record does not reveal what, if anything, the State provided in response, although the prosecutor's file apparently revealed that he had complied. However, Duplantis also filed a motion to suppress any written or oral confessions on September 25, 1991. This motion was heard on November 8, 1991, at which time Duplantis argued that any statements made by him had been coerced or obtained in exchange for promises and were not voluntary. The trial court ruled that both the oral statement to Mississippi authorities and the written statement to Tennessee authorities were given freely and voluntarily and were not made in exchange for promises or in the hope of reward or duress. Duplantis' motion to suppress was overruled.
At trial, the State did not attempt to introduce the written statement obtained by the Tennessee authorities. Instead, the prosecution offered the testimony of Jackie Knight regarding the oral statement Duplantis made to Mississippi authorities. On cross-examination, Knight testified that Chief Mike Vick had reduced Duplantis' statement to writing prior to the suppression hearing and that he *1249 (Knight) had seen it. The court then called a recess and the jury was excused. Upon reconvening without the jury, the court announced that defense counsel had approached the court during recess and asked for additional time to study a document just produced by the State. The court instructed counsel to wait and make his motion in the courtroom. At this point, Duplantis moved that the court strike the portion of Knight's testimony concerning the written memorandum of Duplantis' statement, made by Vick, and instruct the jury to disregard it. Duplantis also requested a mistrial.
According to Duplantis, he had not seen a copy of Vick's memorandum until the immediately preceding recess, when counsel for the State provided him with a copy. This memorandum, claimed Duplantis, differed from prior testimony and discovery regarding Duplantis' statement in one particular. Duplantis argued that this inconsistency, i.e., whether or not there was a struggle between him and Thrash, would tend to prejudice his defense.
The State responded that since Duplantis had questioned Knight about Vick's memorandum, a copy was provided to the defense during recess. Counsel for the prosecution further stated that he checked the file at recess, which revealed he had provided to the defense the substance of the oral statement on November 1, 1991.[12] This discovery contained the same language as did the memorandum at issue: "As Thrash entered the door, Duplantis stated he grabbed him, and there was a struggle in which Strickland hit Thrash in the head with the bolt cutters." Therefore, according to the State, Duplantis could not claim prejudice due to previously undisclosed evidence. In rejoinder, Duplantis argued that the jury should not be allowed to hear sworn testimony contrary to what the same witnesses had given on prior occasions on such a critical issue.
The trial court found that Vick's memorandum was not inconsistent with the testimony provided by Knight at this trial or at the suppression hearing and was further consistent with the testimony offered by Chief Vick. The judge noted that the memorandum stated it was not intended to be exact and found exclusion of such evidence was not warranted. When defense counsel stated that he would like some time to confer with co-counsel, the trial judge responded:
Well, I am going to bring the jury in and continue with the case until twelve o'clock, and then I will let you have an opportunity to confer with co-counsel, examine this statement, and make any announcement to the Court that you wish... . Anything else?
Duplantis' objection and motion for mistrial were overruled.
The jury was then returned to the courtroom and Duplantis continued his cross-examination of Knight. Following the noon recess, counsel for both sides announced they were ready to proceed. Duplantis made no mention of a continuance. Vick's memorandum was never introduced by the State and is not a part of the record before this Court.

Discussion
Box v. State, 437 So.2d 19 (Miss. 1983) (Robertson, J., specially concurring), first set forth the procedure trial courts should follow when confronted with a discovery violation. Miss.Unif.Crim.R.Cir.Ct.Prac. 4.06 now reflects the Box procedure. This procedure is equally applicable in capital cases. Hansen v. State, 592 So.2d 114, 138-39 (Miss. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1970, 118 L.Ed.2d 570 (1992); Cole v. State, 525 So.2d 365, 368 (Miss. 1987), cert. denied, 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 348 (1988).
When faced with previously undisclosed evidence to which the defendant has objected, the trial court should give the defendant a reasonable opportunity to familiarize himself with the evidence. If the defendant thereafter believes he may be prejudiced by admission of the evidence because of his lack of opportunity to prepare to meet it, *1250 he must request a continuance.[13] Should the defendant fail to request a continuance, he has waived the issue. If he indeed requests a continuance, the State may opt to proceed without the undisclosed evidence, else the trial court must grant the continuance. Cole, 525 So.2d at 368. Failure to follow the Box guidelines is prejudicial error, requiring reversal and remand. Darghty v. State, 530 So.2d 27, 33 (Miss. 1988).
It is Duplantis' duty to present to this Court a record adequate to reveal any reversible errors and further, evidencing his procedural preservation of such error. Hansen, 592 So.2d at 127, quoting Queen v. Queen, 551 So.2d 197, 199 (Miss. 1989). The record before this Court contains no proof that the State failed to supply the defense with discovery containing the substance of the statement; the State alleged compliance at trial. The record also contains neither the memorandum of the statement nor the transcript of the preliminary hearing.[14] Duplantis' failure to present a proper record to this Court prevents review of this issue.
Even if not otherwise barred, this is not a typical Box situation or violation. Knight was called by the State to testify regarding Duplantis' statement. In Knight's narrative, he noted that a struggle ensued after Duplantis jumped Thrash. On cross-examination, Knight was asked whether anyone had reduced` Duplantis' statement to writing and Knight answered that Vick had done so and Knight had seen it. Shortly thereafter, when the court announced a recess, the prosecution provided Duplantis with a copy of Vick's memorandum. When court resumed, Duplantis moved to strike the portion of Knight's testimony regarding the memorandum because it had not been previously disclosed and because it differed from prior testimony.
The State did not attempt to offer Vick's memorandum of Duplantis' statement at trial, nor did Knight's testimony regarding this memorandum differ at all from the testimony he had offered on direct or from the discovery the State claimed to have sent Duplantis on November 1, 1991. There was no danger of prejudice to Duplantis as a result of admission of the evidence because the memorandum was not admitted. Nonetheless, Duplantis properly preserved any error by requesting a mistrial, which was denied by the court. The State then proceeded without use of Vick's memorandum.
Duplantis was not faced with evidence, the substance of which was not disclosed before trial. See Harrison v. State, 635 So.2d 894, 906 (Miss. 1994). As in Holland v. State, 587 So.2d 848, 867 (Miss. 1991), Duplantis knew not only the substance of Duplantis' statement prior to trial, but the particulars, either via discovery or through Knight's testimony at the suppression hearing. Although at the suppression hearing Knight did not explicitly say "a struggle ensued," he did say: "the only time that K.C. [Strickland] was to get in it was if it got out of control" and "he [Duplantis] got him and pushed him into a corner and had his arms pinned." The only reasonable inference to be drawn from Knight's testimony, that Duplantis jumped Thrash when he entered the house, is that Thrash would reflexively struggle. The struggle, in turn, drew Strickland into the fray.
At trial, Duplantis was faced with no previously undisclosed evidence; Box is not applicable to this factual scenario, and, consequently, the trial court was not required to comply with the Box guidelines. Unlike the facts in Harrison, there was no "willful withholding of crucial evidence during discovery." Harrison, 635 So.2d at 900. Nonetheless, Vick's memorandum of Duplantis' statement should have been provided by the State. This will present no problem on retrial because the defense has now seen the memorandum. There is no error here.
There is also no Box violation as regards the tape recording as it was (1) useless/inaudible, (2) never offered by the *1251 State at trial, and (3) not crucial evidence willfully withheld during discovery.

R. Whether the trial court's warning that the content of Duplantis' personal closing statement would decide whether the prosecution could attack his failure to testify is error in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and corresponding sections of the Mississippi Constitution.

Additional Relevant Facts
Upon learning that Duplantis wished to make his own statement as part of closing argument, the trial judge met with Duplantis and his attorneys in chambers. The judge then inquired of defense counsel whether Duplantis had been thoroughly advised as to the effect his statement could have on the jury. Defense counsel answered that although he had gone over some statements with Duplantis, he didn't know that Duplantis had been thoroughly advised. The prosecutor then asked whether Duplantis' statement would waive any problems the State would encounter concerning "commenting on his failure to testify and then to get up and argue, without being under oath?" The trial judge responded:
Well, I will rule on that when it gets here. I don't think the fact that a Defendant argues a case waives his failure to testify, unless in his argument, he argues facts not developed in the trial of the case. If he argues facts that have not been testified to, I think he would waive his failure to testify. If I was a prosecutor, I would be very reluctant to argue, afraid some Supreme Court Judge or Federal Judge might consider otherwise. I want you at this time, I want you to understand, David Duplantis, that you have the right to participate to a limited extent in your argument of your case, but I want you to go and be advised and go over any effect that they think that might have on the jury. So, you go talk to your lawyers about it, and you be advised, and when you come back in, the only question I am going to ask you now is whether or not you want to argue. Okay?
Here Duplantis and his attorneys retired for about five minutes. When they returned to chambers, Duplantis told the judge he had been advised not to participate in closing argument and he would accept that advice.

Discussion
In setting forth guidelines for the circuit courts to follow when a defendant wishes to participate in argument of his case, this Court has said:
the court [should] warn him that if he state[s] facts which only he could support, and ... did not take the witness stand himself, the State would be free to comment upon the fact that no such statement was made by him as a witness under oath. Jones v. State, 381 So.2d 983, 994 (Miss. 1980). An accused who does not intend to testify himself under oath cannot be permitted, any more than any other litigant, to have the jury consider as evidence any statements of fact not subject to rigorous cross-examination of the witness under oath.
Bevill v. State, 556 So.2d 699, 710-11 (Miss. 1990).
Although Bevill dealt with a defendant who desired to participate in opening argument, the same reasoning applies to Duplantis' participation in closing argument. The trial court merely performed its duty by insuring that Duplantis was fully informed of the risk inherent in participating in closing argument. There is no error here.

SENTENCING PHASE ISSUES

Y. Whether Duplantis' sentence of death is disproportionate.

The Parties' Contentions and Discussion
Miss. Code Ann. § 99-19-105(3) (Supp. 1993) requires this Court to consider the proportionality of Duplantis' death sentence:
With regard to the sentence, the court shall determine:
(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
(b) Whether the evidence supports the jury's or judge's finding of a statutory *1252 aggravating circumstance as enumerated in Section 99-19-101; and
(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
Duplantis claims that his death penalty is disproportionate when compared to other capital cases reviewed by this Court because the jury found only that he had contemplated the use of lethal force while Strickland, whom Duplantis asserts received only a life sentence, struck all of the blows. The State disagrees and points out that Duplantis actively participated, according to a preconceived course of conduct, by holding and incapacitating Gary Thrash. While this issue does not warrant discussion at this time, due to the reversal on the confession issue, this Court does point out that opinions exist suggesting due consideration should be given to this area.[15]

CONCLUSION
Because Duplantis was subjected to interrogation by authorities after he invoked his Fifth Amendment right to counsel, in direct violation of Edwards, his confession should not have been found admissible at trial. Consequently, Duplantis' conviction of capital murder and sentence of death are reversed and remanded to the Circuit Court of Newton County. Discussion is not warranted on the other issues raised by Duplantis because each is either barred, meritless, or based on facts in this record which may not reoccur at retrial.
CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH REVERSED AND REMANDED TO THE CIRCUIT COURT OF NEWTON COUNTY.
HAWKINS, C.J., and SULLIVAN, PITTMAN and BANKS, JJ., concur.
DAN M. LEE, P.J., dissents with separate written opinion.
McRAE, J., dissents with separate written opinion joined by JAMES L. ROBERTS, Jr., J.
SMITH, J., not participating.
DAN M. LEE, Presiding Justice, dissenting:
On June 17, 1991, David W. Duplantis, while being held in the Madison County, Tennessee jail, initiated a conversation with Chief Deputy Vick of the Lauderdale County Sheriff's office. During this conversation, Duplantis confessed to Vick his role in the murder of Gary Thrash. When it became apparent that the State would pursue capital murder charges against him, Duplantis did what all individuals fighting for their life do; he sought to have this confession that he initiated suppressed and claimed that his confession was taken in violation of his Fifth Amendment right to counsel. Now, the majority suggests that Duplantis did not initiate the contact with Vick, and therefore, we must reverse Duplantis' conviction for capital murder and remand this case to the Newton County Circuit Court. Because I cannot agree with the majority's contention, I respectfully dissent.
The majority argues that Vick would not have been in the bathroom with Duplantis were it not for Knight's questioning of Duplantis in the first instance and that Duplantis responded to Knight's questioning by asking to talk to Vick instead. The majority argues that Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) and Minnick v. Mississippi, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) require reversal in the case sub judice. The United Supreme Court in Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), stated:
... "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated *1253 initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. (emphasis added).
Id., 451 U.S. at 484-485, 101 S.Ct. 1880, 68 L.Ed.2d at 386.
The United States Supreme Court in Minnick, also recognized that the defendant who had invoked his Fifth Amendment right to counsel could waive this right after he had earlier invoked said right. The Court in Minnick, stated:

Edwards does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversation with the authorities; ... (emphasis added).
Id., 498 U.S. at 156, 111 S.Ct. 486, 112 L.Ed.2d at 499.
It is evident from reading the record that Chief Deputy Vick did not initiate the contact with Duplantis. The following exchange took place during Duplantis' hearing to suppress his confession made to Chief Deputy Vick:
Q. Officer Knight, I want to show you this document here and ask if you can identify that, please?
A. Yes, I can identify it.
Q. What is that?
A. That's his rights, waiver of rights.
Q. And, did you read those rights to David Duplantis before talking to him?
A. Yes, I did.
... .
Q. And, after you read that to him, did he, in fact, sign the waiver of rights?
A. Yes, he did.
... .
Q. (Duncan) Deputy Knight, after this was read to him and the form was executed, would he give you a statement?
A. No, he would not.
Q. Did he indicate that he would talk to somebody else?
A. Yes. After I read him his rights and started asking him questions, he said he wanted to talk to Chief Vick. Said he didn't know me.
Q. Okay. Now, who is Chief Vick?
A. That's Mike Vick, Chief Deputy of Lauderdale County.
Q. Okay; and, where was he?
A. He was outside the room. I don't know exactly where.
Chief Deputy Vick said that while Duplantis was being photographed and processed, he was Mirandized and that they (Knight, Vick, Vincent) talked to him. Vick testified that Duplantis did not make any statement to the Mississippi law enforcement officers at that time. Vick then testified that after the Mississippi law officers had finished processing Duplantis, he (Duplantis) asked Vick to take him to the restroom and give him a cigarette. Vick took Duplantis to the restroom and gave him a cigarette. While in the restroom, Duplantis began to talk to Vick about his escape from the Lauderdale County jail and his involvement in the murder of Gary Thrash. Subsequent to this conversation, Duplantis signed two separate statements; one to the Tennessee law officers and one to the Mississippi law officers. Duplantis also signed a Miranda warning form and waiver of rights paragraph after he gave each of the statements.
After reviewing the record, it is apparent that, even though Duplantis signed a waiver of rights form for Officer Knight, Duplantis did not waive his Fifth Amendment right to counsel as to conversations he had with Knight before asking to speak to Chief Deputy Vick. However, once Duplantis specifically asked to speak to Deputy Vick and then initiated conversation with him, Duplantis did waive his Fifth Amendment right to counsel. Minnick, supra; Edwards, supra. It is obvious that Duplantis knew Vick and initiated the conversation with him in hopes that Vick would take him back to Mississippi and help him obtain a polygraph test. Evidently, Duplantis believed that if he was given a polygraph *1254 test, he would be cleared of the drug charges that he had been incarcerated on at the time of his escape. Therefore, I would argue that Duplantis knowingly, voluntarily and intelligently waived his right to counsel under the Fifth Amendment, Edwards, supra, and that he initiated the conversation with Deputy Vick as contemplated by Minnick, supra; Edwards, supra.
Accordingly, I respectfully dissent.
McRAE, Justice, dissenting:
Common sense and case law dictate this dissent.
Duplantis was charged by the State of Mississippi for murder. He was also charged by the State of Tennessee for other unrelated crimes. The Tennessee authorities' initial interrogation of Duplantis, where he requested counsel, concerned the investigation of the Tennessee crimes, not the Gary Thrash murder which occurred in Mississippi. The Mississippi authorities who questioned Duplantis were not aware of his previous assertion of his fifth amendment right to counsel. However, the fact that Duplantis had earlier invoked his right to counsel is of no consequence since it regarded a separate crime in a separate jurisdiction. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, reh'g denied, 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981) should not be stretched to fit the facts of the case at hand. If there exists a Fifth Amendment right to counsel problem, it would be with regard to the Tennessee charges, not the Mississippi charge of murder.
Although this Court has never before had an occasion to render a decision involving the particular facts in the case at hand, other states have. In State v. Dampier, 314 N.C. 292, 333 S.E.2d 230 (1985), the Supreme Court of North Carolina held that there existed no constitutional violation of the defendant's Sixth Amendment right to counsel where North Carolina authorities questioned the defendant about a North Carolina murder following the questioning of the defendant by Georgia officers about unrelated criminal charges occurring in Georgia. Dampier, 333 S.E.2d at 234. In Dampier, the defendant was arrested in Georgia for automobile theft, armed robbery and first-degree murder, all occurring in Georgia. Id. 333 S.E.2d at 232. During questioning by Georgia officers, defendant asserted his Fifth Amendment right to counsel, and pursuant to Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) the Georgia officers immediately ceased the interrogation. Id. North Carolina authorities later arrived in Georgia and asked to question the defendant. The defendant was taken into an interview room and was interrogated by the North Carolina authorities about a murder which occurred in North Carolina. Id. At this time, the defendant was Mirandized and signed a "waiver of rights." Dampier, 333 S.E.2d at 232. The defendant then gave an oral statement incriminating himself concerning the North Carolina murder. Id. 333 S.E.2d at 233.
In Dampier, the defendant argued that his confession given to North Carolina officers should have been suppressed according to Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). As it is well known, the Supreme Court in Edwards held:
[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.
Edwards, 451 U.S. at 484-85, 101 S.Ct. at 1887. The Supreme Court of North Carolina rejected this argument and held that there had been no violation of the defendant's Fifth Amendment rights:
Because of factual distinctions, however, the rule in Edwards is inapplicable to the case at bar. In Edwards, the defendant's subsequent interrogation was conducted by officers from the same agency as those to *1255 whom he had earlier requested an attorney, and the inculpatory statement given by him involved the same crime for which his right to counsel was previously invoked. In contrast, this defendant invoked his right to counsel only in the presence of Georgia authorities. The subsequent interrogation was by North Carolina authorities and the ensuing inculpatory statement involved crimes wholly separate from those for which he previously invoked his right to counsel ... We hold that under the facts of this case, the North Carolina officers were not charged with defendant's request for counsel made to Georgia authorities concerning unrelated Georgia offenses and that their initiation of questioning was not prohibited.
Dampier, 333 S.E.2d at 234-35 (emphasis added).
Additional case law exists in support of this dissent's position. In State v. Willie, 410 So.2d 1019 (La. 1982), the Supreme Court of Louisiana held that a defendant's refusal to be questioned by FBI agents about federal crimes without an attorney present was not a per se invocation of his Fifth Amendment right concerning independent and unrelated state offenses. Willie, 410 So.2d at 1028. In Willie, the defendant was wanted in Louisiana for murder but was later arrested in Arkansas for unrelated crimes of aggravated rape, aggravated kidnapping and attempted murder. Id. at 1023. During questioning by Arkansas officers and FBI agents, the defendant refused to answer any questions in the absence of an attorney. Id. at 1026. Days later, Louisiana authorities arrived in Arkansas, fully advised Willie of his constitutional rights and questioned Willie regarding the Louisiana murder. Willie specifically stated that he did not need the assistance of an attorney and then incriminated himself in the Louisiana murder. Id. at 1027.
The Louisiana Supreme Court based its decision in reliance on Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) wherein the Supreme Court provided:
We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them without appropriate warnings.
Miranda, 384 U.S. at 496, 86 S.Ct. at 1639. See McFadden v. Commonwealth, 225 Va. 103, 300 S.E.2d 924, 927 (1983) (where defendant invoked his fifth amendment right to counsel in one jurisdiction, no violation of defendant's constitutional right to counsel existed when defendant was questioned by officers of another jurisdiction); People v. Young, 153 Ill.2d 383, 180 Ill.Dec. 229, 607 N.E.2d 123, 128 (1992), cert. denied ___ U.S. ___, 114 S.Ct. 97, 126 L.Ed.2d 64 (1993) (Wisconsin authorities' knowledge of defendant's invocation of Fifth Amendment right to counsel may not be imputed to Illinois authorities).
Both Tennessee and Mississippi authorities handled their investigations with ample regard for Duplantis' constitutional rights. Under these circumstances, there exists no violation of defendant's Fifth Amendment rights under the Edwards rule. Accordingly, I dissent.
JAMES L. ROBERTS, Jr., J., joins this opinion.
NOTES
[1] The house Charlene Thrash rented was only about 12 or 13 miles from the Lauderdale County Jail.
[2] No Mississippi officer had yet arrived in Tennessee.
[3] Duplantis was taken back to Mississippi that day.
[4] Vick told Duplantis that if any deals were to be made, he and the other officers there in Tennessee were not the people with the authority to do so.
[5] Once back in Mississippi, Knight learned that this taping was unsuccessful and resulted in a cassette which was inaudible, even after a sound expert had tried to bring up the sound and reduce the buzz. Knight then reduced to writing Duplantis' statement, based on his (Knight's) memory.
[6] 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).
[7] 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990).
[8] But Knight testified: "After I read him his rights and started asking him questions, he said he wanted to talk to Chief Vick." (emphasis added)
[9] Although Duplantis did not raise the Edwards argument in his motion to suppress, it was argued at the suppression hearing.
[10] Morgan was decided after the trial in the instant case; it was also decided after the trial in Foster. This Court's opinion in Foster applies the teaching of Morgan without any discussion of whether it should be applied retroactively. However, in Irving v. State, 498 So.2d 305, 311 (Miss. 1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987), this Court found that the reverse-Witherspoon issue was not so novel that a defendant could raise it on PCR although he had not raised it on direct appeal.
[11] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[12] The prosecutor said he would accept the blame if this discovery had not been sent, although he felt there still would be no prejudice to Duplantis because neither the memorandum nor the discovery of November 1, 1991 impeached Knight's testimony.
[13] A motion for mistrial will suffice "as a request for a continuance." West v. State, 553 So.2d 8, 18 n. 6 (Miss. 1989).
[14] However, the trial court found that the memorandum was substantially similar to the testimony previously given at the suppression hearing.
[15] Enmund v. Florida, 458 U.S. 782, 797, 102 S.Ct. 3368, 3376, 73 L.Ed.2d 1140, 1151 (1982); Abram v. State, 606 So.2d 1015, 1041-43 (Miss. 1992); Reddix v. State, 547 So.2d 792, 794-95 (Miss. 1989) (plurality); White v. State, 532 So.2d 1207, 1221-22 (Miss. 1988); Bullock v. State, 525 So.2d 764, 766 (Miss. 1987) (plurality).