MOORE, J.,
for the Court:
¶ 1. Appellant Richard Odom was indicted for murder while in the commission of a robbery. Following trial in the Rankin County Circuit Court, the jury found Odom guilty of the lesser offense of murder on November 3, 1978. Ater the trial court granted Odom a new trial, Odom pleaded guilty to murder and was sentenced to life imprisonment. August 31, 1995, the United States District Court for the Southern District of Mississippi reversed the guilty plea and remanded to the trial court for a new trial. Following his second trial, held July 27 through July 29, 1998, the jury again adjudged Odom guilty of murder. Aggrieved, Odom cites the following grounds for appeal
I. APPELLANT DID NOT RECEIVE A FAIR TRIAL BECAUSE HE WAS SHACKLED TO HIS CHAIR DURING THE TRIAL;
II. EVIDENCE AND TESTIMONY CONCERNING A POSSIBLE ROBBERY WERE INADMISSIBLE AND SHOULD HAVE [BEEN] EXCLUDED;
III. THERE WAS NO EVIDENCE TO SUPPORT ANY OF THE CONFESSIONS PURPORTEDLY GIVEN BY THE APPELLANT;
IV. ADMISSION OF THE DECEDENT’S PHOTOGRAPH WAS PREJUDICIAL AND REQUIRES REVERSAL;
V. THE PROSECUTOR MADE AN IMPROPER COMMENT DURING CLOSING ARGUMENT AND FAILED TO GRANT A MISTRIAL;
VI. APPELLANT WAS DENIED HIS RIGHT TO A SPEEDY TRIAL; AND
VII. THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A VERDICT OF GUILT AND THE VERDICT WAS AGAINST THE *192 OVERWHELMING WEIGHT OF THE EVIDENCE.
Finding no merit, we affirm.
PROCEDURAL HISTORY
¶ 2. This ease stems from a homicide which occurred May 4, 1978, at the Show-town East Drive-in Theater in Pearl, Mississippi. Appellant Richard Odom was indicted for murder while engaged in the commission of an armed robbery, a capital offense. Following a jury trial in the Rankin County Circuit Court, Odom was found guilty of the lesser offense of murder on November 3, 1978. Odom then requested and received a new trial apparently because the State exercised thirteen peremptory challenges when it was only allowed twelve. Upon advice of counsel, Odom pled guilty to murder on December 19, 1978, and was sentenced to life imprisonment. December 31, 1984, defendant filed a petition for writ of error coram nobis alleging that ineffective assistance of counsel induced his guilty pléa. Specifically, Odom claimed he would not have entered a guilty plea had he realized that he could not be retried for capital murder and that the highest penalty he could face was life imprisonment. January 4, 1985, the Rankin County Circuit Court summarily denied Odom’s petition for writ of error coram noblis. February 6, 1986, the Mississippi Supreme Court reversed the summary denial of Odom’s petition and ordered the circuit court to conduct a hearing to determine whether sufficient evidence supported Odom’s claim. After a hearing, held on April 4, 1986, the circuit court declined to set aside Odom’s plea. The Mississippi Supreme Court affirmed the circuit court’s decision on November 12, 1986. Odom v. State, 498 So.2d 331 (Miss.1986).
¶ 3. In 1991, Odom escaped from the Simpson County Jail where he was serving his sentence. Shortly thereafter, Odom was arrested in Memphis, Tennessee, and charged with a rape and murder for which he was eventually convicted and sentenced to death. In 1994, Odom filed a petition for writ of habeas corpus with the United States District Court for the Southern District of Mississippi, seeking to have his guilty plea in the present case set aside. August 31, 1995, the district court granted Odom’s petition and ordered the Rankin County Circuit Court to give Odom a new trial on the murder charge. January 3, 1997, the circuit court entered an order to transport Odom from prison in Tennessee to Rankin County to stand trial. Odom was transported to Rankin County July 1997. After a two day trial held July 27— 29, 1998, a jury again found Odom guilty of murder. The trial court sentenced Odom to life imprisonment and ordered the sentence to run consecutively with the sentence imposed in the Tennessee capital murder case. Odom now appeals the July 1998 conviction.
FACTS
¶ 4. May 4, 1978, Becky Roberts’s body was found in the house trailer she shared with her husband at the Showtown East drive-in theater in Pearl, Mississippi. Becky had sustained two gunshot wounds to her head, one through the left eye and one through the forehead, a slashed throat, and several stab wounds, one which had punctured her left lung. Spent rounds from a .22 gauge rifle were collected from the scene. On May 9, 1978, police officers visited seventeen-year-old Richard Odom at the trailer where he lived with his brother, who consented to a search of the trailer. The officers recovered a pair of tennis shoes and a shirt that was missing three buttons from the Odom residence. Odom voluntarily accompanied the officers to the police station to submit to questioning regarding the homicide. He was informed of his Miranda rights in transit.
¶ 5. Odom remained calm and cooperative during the course of interrogation. He gave three separate statements in 1978. In his statement to Jimmy Foster, chief of the Flowood Police Department in 1978, he admitted to being present in the *193 Roberts’s residence when Becky was killed, but he attributed the murder to an older man who he claimed was also present. In his statement to Ernest Simmons, chief of detectives for the Pearl Police Department in 1978, Odom admitted to shooting Becky twice with a bolt action .22 rifle he had found in one of the bedrooms of Becky’s trailer. Odom told Simmons that the first time he shot Becky was an accident caused by her grabbing the barrel of the rifle. Odom told Simmons that he intentionally shot her the second time because he was scared and he wanted to make sure she was dead. In his statement to Clarence Smith, a probation intake officer with the Rankin County Youth Court and a personal acquaintance of Odom, Odom admitted to stabbing Becky and to accidentally shooting her twice. In all three of his 1978 statements, Odom admitted to taking money from the safe that was located at the theater’s concession stand. In 1991, when Odom was arrested in Tennessee and charged with capital murder, he gave two statements to Memphis police officers in which he unequivocally admitted to murdering a woman named “Becky” in Mississippi.
¶ 6. An enormous amount of evidence was collected at the crime scene. The murder weapon, a .22 gauge bolt action rifle which belonged to the victim’s husband, was found on the back floorboard of a stolen car that was located close to the scene of the murder. Odom’s fingerprints were found both on the murder weapon and on the outside of the car in which the gun was located. A bloody palm print that was found on the dryer located in Becky’s trailer matched Odom’s print. Three red buttons that were recovered from the crime scene matched the buttons on the shirt that was recovered from Odom’s residence. In short, an overwhelming amount of physical evidence connected Odom to the crime scene.
LAW AND ANALYSIS
I. DID THE TRIAL COURT ERR IN ALLOWING ODOM TO BE SHACKLED TO HIS CHAIR DURING THE TRIAL?
¶ 7. The trial judge ordered that Odom be shackled to his chair during the course of trial. To prevent undue prejudice, the trial court ordered that Odom be seated in the courtroom before the jury was brought in and to remain until the jury left. Further, the trial court ordered a cardboard barrier to be installed between Odom and the rail dividing the courtroom so the audience could not see the shackles. The trial judge noted that given the circumstances of this case, and the death sentence pending in Tennessee, courtroom security warranted the restraints. Odom argues that he has a right to be tried in front of a jury free from restraint; however, he does not allege that the jury actually saw him shackled.
¶ 8. In Rush v. State, 301 So.2d 297, 300 (Miss.1974), we stated:
It is a common law right of a person being tried for the commission of a crime to be free from all manner of shackles or bonds, whether of hands or feet, when in court in the presence of the jury, unless in exceptional cases where there is evident danger of his escape or in order to protect others from an attack by the prisoner. Whether that ought to be done is in the discretion of the court, based upon reasonable grounds for apprehension.
In Rush, the venire saw the defendant handcuffed for a brief period. The court held this did not prejudice the defendant’s right to a fair trial. In Davenport v. State, 662 So.2d 629, 633 (Miss.1995), three jurors saw the defendant in shackles while he was being transported outside the courthouse. The court found even less of a reason to find prejudice than in Rush. In the case sub judice, the jury did not see Odom shackled. The trial judge’s exercise of discretion was based upon reasonable grounds of apprehension because Odom had a death sentence hanging over his *194 head in Tennessee and because he was a prison escapee. This ground of error is without merit.
II. WAS EVIDENCE AND TESTIMONY CONCERNING A POSSIBLE ROBBERY INADMISSIBLE AND SHOULD IT HAVE BEEN EXCLUDED?
¶ 9. Odom claims that his motion in limine to exclude evidence of a possible robbery attempt at Becky’s residence should have been granted on double jeopardy .and M.R.E. 404(b) grounds. Specifically, Odom argues that the jury in his first trial acquitted him of capital murder where the underlying felony was robbery. Odom argues the verdict in his first trial indicates that the State did not prove him guilty of robbery and that introduction of evidence of robbery in his second trial constituted double jeopardy.
¶ 10. The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides no person shall “be subject for the same offense to be twice put in jeopardy of life and limb.... ” The United States Supreme Court has held that the Double Jeopardy Clause affords three protections to a criminal defendant:
The first two, which are the most familiar, protect against a second prosecution for the same offense after acquittal, and against a second prosecution for the same offense after conviction.... [T]he third aspect of the Double Jeopardy Clause [protects] against “multiple punishments for the same offense” imposed in a single proceeding.
Jones v. Thomas, 491 U.S. 376, 381, 109 S.Ct. 2522, 105 L.Ed.2d 322 (1989). Odom was acquitted of murder during the commission of a robbery, a capital offense; thus, he could not be retried for capital murder. The jury’s acquittal on the capital crime does not imply that the jury did not believe that Odom took items from Becky’s trailer; instead, it shows that the jury did not believe that the murder occurred during the commission of a robbery. Introduction of evidence connecting Odom to items taken from the crime scene did not twice put Odom in jeopardy of life and limb for capital murder or robbery.
¶ 11. M.R.E. 404(b) disallows admission of evidence of other crimes, wrongs, or acts to prove the character of a defendant to show that he acted in conformity therewith. M.R.E. 404(b) does allow, however, admission of evidence of crimes, wrongs, or acts “for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.”
¶ 12. In Duplantis v. State, 644 So.2d 1235 (Miss.1994), the court held that evidence that the defendant had escaped from prison, had broken and entered, and had committed larceny was admissible in a murder trial because these other crimes or bad acts were “ ‘so interrelated as to constitute a single transaction or occurrence or a closely related series of transactions or occurrences.’ ” Id. at 1246 (quoting Wheeler v. State, 536 So.2d 1347, 1352 (Miss.1988)). Evidence of the prison escape was admissible where it showed the defendant’s motive for murdering the occupants of the house where he hid. Evidence that the defendant had broken into a stockyard and had stolen food and bolt cutters was admissible where the bolt cutters were used to murder the victim. The evidence was also necessary to convey the complete story to the jury, and it connected the defendant to the crime scene.
¶ 13. In the case sub judice, the murder weapon belonged to Becky’s husband who kept it in a bedroom closet at their trailer. The weapon was found in a stolen car located away from the Roberts residence. Odom’s fingerprints were on the murder weapon and on the stolen car, thus linking Odom to the crime scene.. Evidence that Odom took money from the safe corroborates information that Odom gave in his statements to the authorities. Odom’s taking of the rifle and the money from the *195 Roberts residence during the events surrounding the murder were part of a series of transactions that ultimately led to Becky’s demise. In other words, this evidence was “part of the res gestae, part of the overall scenario.” Ballenger v. State, 667 So.2d 1242, 1256 (Miss.1995). Further, introduction of the evidence that Odom took items from the crime scene satisfied the State’s “legitimate interest in telling a rational and coherent story of what happened.... ” Turner v. State, 478 So.2d 300, 301 (Miss.1985).
¶ 14. Evidence that Odom took items from the murder scene was not offered to show his bad character and that he acted in conformity therewith. It was offered to show that he was present at the crime scene, to corroborate his statements, and to show the various events that transpired around the time of the murder. The evidence is admissible under M.R.E. 404(b). The evidence also passes muster under M.R.E. 403. Ballenger, 667 So.2d at 1257. Since “[t]his is not an instance were [sic] a jury hears about another similar crime which would likely cause them to find guilt because [he] had done it before,” Id., the “risk of unfair prejudice is minimal.” Duplantis, 644 So.2d at 1248. The prejudicial effect of the evidence did not outweigh its probative value; therefore, the trial court properly admitted the evidence.
III. WERE THE CONFESSIONS PRODUCTS OF COERCION AND SHOULD THEY HAVE BEEN SUPPRESSED?
¶ 15. Odom gave a total of five confessions, three in 1978 and two in 1991. After conducting suppression hearings outside the presence of the jury, the trial court ruled that all five confessions were voluntary and admissible. Odom argues that he was an uneducated, seventeen-year-old boy who was intimidated into giving his confessions to Jimmy Foster and Ernest Simmons. Specifically, he claims that four officers “kept on coming in” during his confession to Foster and that the officers showed him pictures of the victim and told him he was going to die in jail. .He also complains that his parents were not present during the interrogations. He claims that he could not read and write in 1978, and that the officers wrote his statements down and intimidated him into signing them. While there is no question that he was informed of his Miranda rights before giving his statements to Foster and Simmons, Odom’s waivers were not in writing.
¶ 16. Odom claims that the State used subterfuge in obtaining his confession to Clarence Smith because he thought Smith was present as his friend. Smith and Odom were acquaintances, and Smith was present at Odom’s request and not in his official capacity as a Rankin County Youth Court employee. Odom, who questioned the lack of a written waiver of rights in the Foster and Simmons confessions, questions why he had to sign a written waiver of his Miranda rights before giving a statement to his Mend Smith. He claims that Smith was really present as an agent of the State and that the court deplores this type of psychological ploy.
¶ 17. Odom argues that the 1991 confessions to the Memphis authorities were not necessary to the State’s case since it already had the three 1978 confessions. Odom further alleges that the 1991 statements, introduced through a Memphis police officer, would lead the jury to believe that Odom was at some time in Memphis under circumstances requiring his arrest. This evidence was more prejudicial than probative according to Odom and should have been excluded under M.R.E. 403.
¶ 18. The trial court determines as a finding of fact the voluntariness of a defendant’s confession. We may not disturb the trial court’s finding “ ‘unless the trial judge applied an incorrect legal standard, committed manifest error, or the decision was contrary to the overwhelming weight of the evidence.’ ” Hunt v. State, 687 So.2d 1154, 1159 (Miss.1996) (quoting Lee v. State, 631 So.2d 824, 826 (Miss. *196 1994)). The State must prove beyond a reasonable doubt all facts prerequisite to admissibility of a defendant’s confession. Blue v. State, 674 So.2d 1184, 1204 (Miss.1996). Once the trial court rules a confession is admissible, the defendant’s burden in reversing the decision on appeal is heavy. Hunt, 687 So.2d at 1160.
¶ 19. Before ruling that a confession is voluntary, the “trial judge must ‘determine whether the accused, prior to his confession, understood (a) the content and substance of the Miranda warnings and (b) the nature of the charges of which he was accused.’ ” Blue, 674 So.2d at 1205. Odom’s age and intelligence level did not in and of itself render his confessions involuntary. Blue, 674 So.2d at 1204 (holding confession of a seventeen-year-old with a low IQ voluntary in a capital murder case).
¶ 20. The record reveals that Odom both understood the Miranda warning and understood the nature of the charges of which he was accused. Odom had dropped out of school in the seventh grade and he had been living with his brother, away from his parents, and was making it on his own before the murder. He testified at the Foster suppression hearing that “coming off the streets’’ he knew about Miranda rights and had had them read to him before. While Odom claims that he signed the Foster statement because Foster had threatened and coerced him into doing so, Foster and Eu-dean Adcock, a Mississippi Highway Patrol officer who witnessed Odom’s statement to Foster, testified that Odom was not threatened or coerced in any way. Tony Stewart, a lieutenant at the Pearl Police Department in 1978, witnessed Odom’s statement to Ernest Simmons. Both Stewart and Simmons testified at the suppression hearing that Odom seemed to understand what was going on and that he never requested an attorney or his parents. There is no evidence that the trial court applied an incorrect legal standard or committed manifest error in finding that Odom’s statements to Foster and Simmons were voluntary. Further, the trial court’s decision was not against the overwhelming weight of the evidence. That Odom did not waive his rights in writing is of no consequence since the lack of a written waiver does not invalidate the waiver. Moore v. State, 493 So.2d 1301, 1303 (Miss.1986).
¶ 21. Odom’s statement to Smith was also voluntarily given, as evidenced by the written waiver of Miranda rights he signed. When Smith requested Odom to sign the waiver, Odom knew that Smith was not present simply as his friend and Odom’s argument that he was somehow tricked or psychologically manipulated into giving a statement to Smith is without merit. Again, we can find no error in the trial court’s finding that the Smith statement was voluntary.
¶ 22. We find also that the standard of review compels affirmance of the trial court’s decision to admit the two statements Odom gave to the Memphis police in 1991. Since Odom questioned the manner in which his 1978 statements were obtained, the probative value of the 1991 confessions outweighed their prejudicial effect because they were unequivocal admissions. Instead of being a frightened, impressionable seventeen-year-old, he was a grown man who continued to claim responsibility for Becky’s murder approximately thirteen years after the fact. We note that the 1991 confessions were admitted without any mention of the circumstances under which Odom was speaking to authorities in Memphis; therefore, the jury had no knowledge that Odom had been convicted of capital murder in Tennessee.
IV. WAS ADMISSION OF THE DECEDENT’S PHOTOGRAPH PREJUDICIAL?
¶ 23. The State attempted to introduce three photographs of the victim’s body. The trial court allowed the State to choose one of the three to publish to the *197 jury and sustained Odom’s objection to the other two. The trial judge stated his assumption that the photograph would be used in conjunction with the pathologist’s testimony to establish the cause of death.
¶ 24. “Photographs have evidentiary value where they: 1) aid in describing the circumstances of the killing and the corpus delicti; 2) where they describe the location of the body and cause of death; and 3) where they supplement or clarify witness testimony.” Westbrook v. State, 658 So.2d 847, 849 (Miss.1995) (citations omitted). Whether to admit photographs is a decision which rests within the trial court’s discretion and is a decision that we will not disturb absent an abuse of discretion. Id. In Westbrook, the supreme court affirmed the admission of photographs of the victims, finding that the photographs identified the victims, showed the gunshot wound’s effect on the deceased, and corroborated testimony of the physician who performed the autopsies on the murder victims. Id. at 849-50. The court found the photographs were properly admitted even where the defendant did not contradict or deny the killings and where the corpus delicti had been established.
¶ 25. In the case sub judice, the photograph was utilized to corroborate the testimony of Dr. George Sturgis, the forensic pathologist who performed the autopsy on Becky. Further, the photograph was used to identify the victim and to show the effect of the wounds inflicted upon her. The trial court was careful to ensure that the State did not inundate the jury with multiple photographs of the victim, and we find the trial court did not abuse its discretion in admitting one photograph of the deceased.
V. DID THE PROSECUTOR MAKE AN IMPROPER COMMENT DURING CLOSING ARGUMENT THUS REQUIRING THE TRIAL COURT TO GRANT A MISTRIAL?
¶ 26. Odom complains about the following comment made during the prosecutor’s closing argument: “I wish we could get into why, why it is twenty years later, but we can’t? All this evidence is valuable.” Odom objected to this statement, and the trial court sustained his objection. Odom then requested a mistrial which the trial court denied. Odom agrees that counsel normally has considerable latitude in arguing his case; however, citing Craft v. State, 271 So.2d 735 (Miss.1973), Odom argues that the prosecutor transgressed the reasonable bounds of fairness. Odom acknowledges that the trial court sustained his objection to the prosecutor’s statement, but argues that the trial court erred in not granting the mistrial because the “damage was done.”
¶ 27. In Wells v. State, 698 So.2d 497, 513 (Miss.1997), the prosecutor told the jury to send a message by imposing the death penalty upon Wells. While acknowledging that it has cautioned prosecutors from using “send a message”, arguments, the court stated: “[A]n analysis of this assignment of error requires an examination of the context in which it arose.” Id. The court found: “In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor’s remark, but must also take into account defense counsel’s opening salvo.” Id. The Wells court found that the defense counsel was the first to make a “send a message” argument by telling the jury that they should consider what people would say about Leake County if the jury imposed the death penalty on a mentally retarded defendant. The court chose not to fault the prosecutor for suggesting that the “ ‘message’ conveyed by a death penalty verdict would be different than that urged by the defense.” Id.
¶ 28. Odom’s counsel referred to the twenty year delay between his arrest and trial numerous times during the trial and twice during his closing argument. For example, during his closing argument, Odom’s counsel stated in reference to the fingerprint expert’s testimony: “Twenty years, twenty years later he assured us [that there were matching characteristics *198 between Odom’s known fingerprints and those found on the murder weapon].” In referring to the testimony of Jim Dial, a criminologist with the Jackson Police Department, Odom’s counsel again raised the twenty year time period as follows: “Folks, you know, I find that hard to believe that you could twenty years later remember all those firearm examinations he has made and suddenly that yeah, most normal Stevens bolt action twenty two rifles have got a three pound trigger pull but this one had a four to five and one half pound one.” In short, Odom raised the twenty year time period, and we cannot fault the State for trying to respond to Odom’s “opening salvo.”
¶ 29. Further, any error was rectified when the trial court sustained Odom’s objection. “It is presumed that the jury follows the judge’s instructions and ignores comments that have been objected to and sustained by the judge.” Davis v. State, 660 So.2d 1228, 1253 (Miss.1995). The trial court correctly overruled Odom’s motion for a mistrial.
VI. WAS APPELLANT DENIED HIS RIGHT TO A SPEEDY TRIAL?
¶ 30. Odom complains that the State failed to observe his statutory right to a speedy trial. Miss.Code Ann. § 99-17-1 (Rev.1994) requires that an accused be brought to trial within 270 days of his indictment unless there is good cause for a delay. The 270 day rule does not apply to retrials; therefore, Odom is relegated to the constitutional speedy trial standards. Mitchell v. State, 572 So.2d 865, 870 (Miss.1990).
¶ 31. The trial court conducted a speedy trial hearing on July 27,1998, the first day of Odom’s new trial. The trial court noted, in denying Odom’s motion to dismiss for failing to provide a speedy trial, that it heard testimony and arguments from counsel at the hearing. A transcript of the speedy trial hearing is not in the record; thus, we are unable to determine upon what basis the trial court ruled that Odom’s constitutional speedy trial rights were observed. Odom has the burden to see that the “record contained all data essential to an understanding and presentation of matters relied upon for reversal on appeal.” Shelton v. Kindred, 279 So.2d 642, 644 (Miss.1973). Further,
This Court may not act upon or consider matters which do not appear in the record and must confine itself to what actually does appear in the record. It must be presumed that the rulings of the trial court were correct, and such presumption will prevail, unless the actual record supports the contrary view.

Id.

¶ 32. In the case sub judice we presume that the trial court’s denial of Odom’s motion to dismiss was correct and supported by the facts that were revealed during the course of the speedy trial hearing. The record does not support a contrary view. In fact, contrary to Odom’s assertion that he was not granted an attorney until January 1998, the record reveals that Odom had court-appointed counsel at least by January 3, 1997, months before his transfer from prison in Tennessee. When his attorney was allowed to withdraw due to a conflict of interest, the court appointed two attorneys to replace him. Odom fired these attorneys in September 1997 and moved for appointment of new counsel November 1997. The attorney who represented him at trial, and on appeal, was appointed in January 1998. Apparently, at least part of the delay can be attributed to Odom.
¶ 33. We note that the U.S. District Court ordered a new trial on August 31, 1995. We further note that Odom was not actually transferred to Mississippi until July 2, 1997. We assume that the trial court had information before it as to the cause of this delay, but we can only speculate as to the reasons. Since Odom failed in his duty to see that the record contained all of the essential data to support his appeal on speedy trial grounds, we must presume the trial court correctly decided the speedy trial issue in the State’s favor.
VII. WAS THE EVIDENCE INSUFFICIENT TO SUSTAIN A VER *199 DICT OF GUILT AND WAS THE VERDICT AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
¶ 34. Odom failed to brief this issue. “In the absence of meaningful argument and citation of authority, this Court generally will not consider the assignment of error.” Govan v. State, 591 So.2d 428, 431 (Miss.1991). The Govan court declined to review the appellant’s weight of the evidence argument where his brief devoted only ten lines to the subject. We decline to consider this assignment of error for the same reasons.
¶ 35. THE JUDGMENT OF THE CIRCUIT COURT OF RANKIN COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT TO BE SERVED IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND TO RUN CONSECUTIVELY TO THE SENTENCE HE IS PRESENTLY SERVING IN THE PENAL SYSTEM OF THE STATE OF TENNESSEE IS HEREBY AFFIRMED. COSTS ARE ASSESSED TO RANKIN COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, IRVING, LEE, PAYNE, AND THOMAS, JJ., CONCUR.