# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2010-KA-00397-SCT

*BRIAN HOLLIMAN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/04/2009 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | STEVEN E. FARESE, SR. |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  DEIRDRE MCCRORY |
| | SCOTT STUART |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 12/01/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE DICKINSON, P.J., CHANDLER AND KING, JJ.**

**KING, JUSTICE, FOR THE COURT:**

¶1.    This is an appeal from the Circuit Court of Lowndes County, in which Brian Holliman

was convicted of the murder of his wife, Laura-Lee Holliman, and sentenced to life in the

custody of the Mississippi Department of Corrections.  Aggrieved, Brian appeals to this

Court.  Finding that the prosecutor made an impermissible golden-rule argument to the jury

and that the trial court failed to instruct the jury to disregard the argument, we reverse and

remand for a new trial consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶2.    Brian and Laura were married in December 2005.  On October 25, 2008, Laura died in her home from a single shotgun wound to the  left side of her face.  On October 29, 2008, a warrant was issued for Brian's arrest, and on February 2, 2009, he was indicted for Laura's murder.  On November 30, 2009, Brian's trial began.

¶3.    The State first called Freda Stacy, Laura's grandmother, to testify. Stacy testified that Laura suffered from a variety of medical problems, including migraine headaches. According to Stacy, on October 21, 2005, she took Laura to a chiropractor, who treated the tension associated with the headaches.  Stacy testified that, on the way to the chiropractor, Laura told her that she had planned to divorce Brian, and she had filed "some sort of papers," but Brian had thrown them away.  According to Stacy, while they were leaving the chiropractor's office, Brian had called Laura continuously, and the two had argued during each call.  Stacy testified that when they arrived back at Laura and Brian's home, the couple continued to argue.  Shortly after arriving home, Laura left to take her sister to cheerleading practice.  Stacy testified that she stayed and spoke with Brian, who told her that he thought Laura was cheating on him.

¶4.    Lee Ann Bradford, a close friend of Laura's, was the State's second witness. Bradford also testified that Laura had been unhappy in her marriage.  According to Bradford, Laura explained that she and Brian had been fighting; one fight had resulted in bruising along her arm, and another fight had resulted in Brian locking her in a closet.  Bradford testified that she had seen Laura at a cheerleading event on the morning of her death, and Laura had said that she had given Brian divorce papers that morning.  Bradford testified that Brian, who was sitting in the stands, continuously called Laura from his cell phone during the event.

2

Bradford testified that Laura had returned home after the cheerleading event, and that they had made plans for later that evening.

¶5.    The State called Steven Hatcher, a lieutenant with the Lowndes County Sheriff's Office, as its next witness. Lieutenant Hatcher and town marshal Ben Kilgore were the first responders to the emergency call reporting a suicide at the Holliman residence. Lieutenant Hatcher testified that, upon arrival, he saw Laura lying in a large pool of blood outside her bedroom closet; a wood-frame-pump shotgun lay beside her. Both Hatcher and Kilgore testified that Brian had told them that he had been outside with the couple's children when he heard a gun shot, went inside, and discovered Laura had committed suicide.

¶6.    Eli Perrigin, a detective with the Lowndes County Sheriff's Office, also testified. Perrigin had arrived at the Holliman house shortly after Hatcher and Kilgore. Perrigin also testified to seeing Laura lying in a pool of blood outside her bedroom closet door. During Perrigin's testimony, the State introduced photographs of the injuries suffered by Laura. Perrigin testified that he had observed two injuries to Laura -- a shotgun wound on the left side of her face, and one of her fingers was blown backwards and attached by a piece of skin. According to Perrigin, there was soot along both injuries consistent with the choke, or vents, on the particular shotgun found near Laura's body. Perrigin testified that the particular shotgun is vented, and when the gun was fired, hot air and gas were expelled through the vents and created a specific pattern of soot.

¶7.    After evaluating the scene, Perrigin had asked Brian to come to the sheriff's office and provide a statement whenever it was most convenient. Perrigin had offered Brian a ride to

3

the sheriff's office, and Brian, along with his brother, had accepted. Brian had provided a statement to Perrigin and described Laura's death as a suicide.

¶8.    Perrigin testified that, on October 28, 2008, he was notified that the pathologist had completed the autopsy, and the results suggested that Laura's death was a homicide. According to Perrigin, he requested that Brian return to the sheriff's office to give another statement. Perrigin testified that, on October 29, 2009, he was present when Brian gave his second statement. During the second statement, Brian stated that Laura's death was the result of an accident. Brian explained that he had entered his bedroom, observed that the shotgun had been removed from its usual place, and found Laura in the closet on her cell phone. Brian explained that he had picked up the gun in an effort to prevent Laura from committing suicide. Brian's statement reads: "In the process of talking, I was bringing the gun down leveling it off with both hands pointed towards [Laura]. The barrel touched her upper body, and she grabbed hold of the barrel. She pushed the barrel away from her, and the gun went off." Brian then admitted to placing the gun near Laura's body to make her death appear to be a suicide. Perrigin testified that Brian was allowed to leave the sheriff's office after he had provided his statement.

¶9.    On October 29, 2008, a warrant was issued for Brian's arrest. Perrigin testified that, once Brian was arrested and escorted to the office, he was given his *Miranda* rights.[1] Brian signed a waiver of his rights and provided the officers with a third statement. Perrigin

---

[1] *See **Miranda v. Arizona**, 396 U.S. 868, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

4

testified that, in Brian's third statement, Brian admitted: "On purpose I pointed the gun at Laura to scare her . . . she hit the gun and I was jarred and the gun went off."

¶10.    Perrigin was questioned regarding whether Laura's death could have been the result of an accident. Perrigin responded and stated, ". . . a gun just don't go off . . . you got to have your finger on the trigger, and the gun has to be loaded, and the trigger had to be pulled." According to Perrigin, that particular type of shotgun would not fire without a round in the chamber. This would require an individual to inject the round into the chamber, pull the port end down, and pull it back up. Perrigin testified that only one round had been loaded into the chamber.

¶11.    The State then called Lisa Funte, medical examiner for Shelby County, Tennessee's Regional Forensic Center, who testified that Laura's autopsy revealed two prominent injuries -- a gunshot wound to the left side of her face and an injury to her right-hand ring finger. Funte testified that the finger was fractured and almost completely amputated, with gray-black discoloration, consistent with soot. Funte testified that the wound to Laura's hand was "consistent with an injury to the finger from gas and gunshot residue emitted from the muzzle of the gun at the time the gun was shot." According to Funte, the injury most likely occurred when Laura "was pushing or slapping the gun away."

¶12.    Two witnesses, Heather Cole and Sara Holliman, were called in Brian's defense. Cole, Brian's friend, testified that Laura was depressed because of her medical problems and had become withdrawn from friends and family. Cole testified that, on the morning of Laura's death, Laura had asked Cole to make sure the cheerleaders were taken care of for the

5

rest of the year. Sara, Brian's mother, also testified that Laura had seemed depressed and withdrawn.

¶13. In rebuttal, the State introduced testimony from Laura's co-workers and friends, and each denied the claims that Laura was depressed. Angela Jones, Laura's friend, testified that, on the day of Laura's death, Laura had told her that she had given Brian divorce papers. According to Jones, Laura had called her later that day and said that she was in the closet because she was upset with Brian. Katie Godfrey, Laura's sister, testified that Laura was not depressed, but that Laura and Brian had been having problems. At the time, Katie was living with Laura and Brian. During the week preceding Laura's death, Katie had witnessed an argument between the couple. According to Katie, Laura was trying to leave the house and Brian had yelled at Laura and locked her in the bedroom closet.

¶14. On December 4, 2009, the jury returned the following verdict: "We, the jury, find the Defendant guilty of murder." Brian was sentenced to life in prison. On January 15, 2010, Brian filed a motion for judgment of acquittal notwithstanding the verdict or in the alternative, a new trial. On March 3, 2010, the trial court denied the motion. On March 10, 2010, Brian filed his notice of appeal.

## DISCUSSION

¶15. Brian appeals the following issues for this Court's review: (1) whether the verdict is supported by sufficient evidence, (2) whether the trial court erred in denying his motion for change of venue, (3) whether the jury was properly instructed, (4) whether the prosecutor made an impermissible golden-rule argument, (5) whether the trial court erred by admitting post mortem photographs into evidence, (6) whether the trial court erred in admitting his two

written statements into evidence, and (7) whether the trial court erred in failing to quash the indictment. Finding reversible error as to issue four, we decline to address the other issues, as issue four is dispositive of this appeal.

**Golden-Rule Argument**

¶16. Brian argues that the trial court erred in allowing the prosecution, over objection, to make an impermissible golden-rule argument to the jury. Specifically, Brian indicates the following argument was impermissible:

> In the statement that [Brian Holliman] gave on October 29th . . . this defendant admitted – I believe the exact words in the statement are: I purposely pointed my shotgun at Laura-Lee Holliman. He purposely pointed a loaded shotgun with the safety off and his finger on the trigger at another human being.
>
> I grew up with guns. And I'm not one to play with them. If I did not have the respect with them that I do, then perhaps it would have been a dramatic thing for me to take that shotgun over there, open the breach, and walk in front of the jury and point it at each and every one of you. What would you have felt if I had done that, Ladies and Gentlemen?
>
> [Brian's counsel objected and was overruled.]
>
> Let's change that a little bit. Let's say that I took a round and put it in the chamber and then walked before you, once again pointing it at each and every one of you, with the safety off and my hand not on the trigger, how would you feel? Would you squirm? You think you might duck?
>
> Let's suppose that I take that loaded shotgun, I point it at you in your face, and I knock the safety off. I still don't have the finger on the trigger.
>
> [Objection was continued by Brian's counsel, and again, overruled.]
>
> How would you feel then? Would you feel threatened, Ladies and Gentlemen? Would you think that I was irresponsible or worse? Would you feel the danger and the presence of it?
>
> Let's say that I put the round in the gun, and I take the safety off, and I put my finger on the trigger, and I point it at you as I come down this line. You'd be

7

outraged. And you should be. Because what I'm doing when I do that is creating a situation that fatal consequences may very likely occur.

¶17. The trial court ordinarily is in the best position to determine if an alleged improper comment had a prejudicial effect; and therefore, absent an abuse of that discretion, the trial court's ruling will stand. *Outerbridge v. State*, 947 So. 2d 279, 285 (¶20) (Miss. 2006) (citation omitted).

¶18. A golden-rule argument, in which an attorney asks the jurors to put themselves in the place of one of the parties, is prohibited. *Wells v. State*, 698 So. 2d 497, 507 (Miss. 1997). This Court previously has held:

> [C]ourts of this country have uniformly held that human beings are unreliable judges of their own affairs; that it is expecting too much of a man to weigh his own case fairly and impartially, since most humans want their own cases to be decided in their favor. It follows, therefore, to advise jurors to decide a case as they would want it decided if they or their loved ones were the litigants is to establish a false standard for the basis of judgments.

*Danner v. Mid-State Paving Co.*, 173 So. 2d 608, 611 (Miss. 1965).

¶19. In this case, the prosecutor erred in repeatedly asking the jurors how they would feel to have a loaded shotgun pointed in their faces. The prosecutor essentially requested that each juror put himself or herself in the place of Laura during the fatal altercation, which was an egregious display of prosecutorial misconduct. This Court previously has determined that the use of a golden-rule argument is reversible error. *Id*. at 788. In the case at hand, the prosecutor's argument was a blatant violation, and the trial court erred in overruling both objections from Brian's counsel. Accordingly, the prosecutor's error is fatal, and this Court reverses the trial court's judgment and remands for a new trial.

8

¶20. The transgression of this long-stated rule by counsel is of particular concern. Accordingly, this Court feels it appropriate to restate its admonition to counsel set forth in *Stringer v. State*, 627 So. 2d 326, 330 (Miss. 1993):

> We take this opportunity to caution the bench and bar of a growing number of reversals caused by inefficient, ineffective or unprofessional conduct by counsel. Retrials of criminal proceedings are extremely costly to the taxpayers of this State. It is not beyond the authority of this Court to assess the entire costs of a new trial to the attorney whose conduct made the trial necessary in those cases where this occurs. Personal liability for this cost may well be imposed by this Court in the future and it will be done with an even hand, applied both to the private attorney and the attorney representing the State. This Court is increasingly unwilling to cast the burden of incompetence on innocent taxpayers and considers this notice to the bench and bar that in the future we may not do so.

*Id*.

¶21. While this Court has been cautious about the imposition of such sanctions, that caution should not be taken by counsel as an unwillingness to do so.

## CONCLUSION

¶22. Because the prosecutor made an impermissible golden-rule argument to the jury, we reverse the judgment of the trial court and remand this case for a new trial.

¶23. **REVERSED AND REMANDED.**

**WALLER, C.J., CARLSON AND DICKINSON, P.JJ., RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**