# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-01633-COA

**NAKERO LASHAWN HAMER JR. A/K/A**          **APPELLANT**
**NAKERO HAMER**

**v.**

**STATE OF MISSISSIPPI**          **APPELLEE**

DATE OF JUDGMENT: 07/12/2019
TRIAL JUDGE: HON. JOHN KELLY LUTHER
COURT FROM WHICH APPEALED: TIPPAH COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT: JOHN D. WATSON
JANE E. TUCKER
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
BY: LAUREN GABRIELLE CANTRELL
DISTRICT ATTORNEY: BENJAMIN F. CREEKMORE
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 03/08/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE BARNES, C.J., McCARTY AND SMITH, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1. After two people were killed and a rifle was stolen, a teenager was arrested and charged with two counts of capital murder and armed robbery. He was tried and found guilty on all charges and sentenced to life in prison without the possibility of parole. Finding no reversible error, we affirm.

## FACTS

¶2. In the early hours of a summer morning, Paul Koster called 911. Frightened, he told the dispatcher that he saw three armed men outside his house via his surveillance camera.

Koster told the dispatcher that he was "scared as hell" and that it looked like they had an "assault rifle." But with relief in his voice, he told the 911 dispatcher the men had identified themselves as FBI agents, and Koster immediately opened the door. As soon as he did, he was shot to death.

¶3. Ayla Hopper was visiting Koster that night. After Koster was shot, the recording preserves her screaming, "Oh my God! Oh my God!" The intruders told her to get down on the ground. They then shot her repeatedly. The 911 call reveals someone in the background saying, "I don't see no more guns." Then, "Let's go! Let's go! We on camera."

¶4. Testimony would later establish that four men went to the house that night. Terrenz Mason would explain that he, Nakero Hamer, Kaderius Hamer, and T.J. Hamer drove to Koster's home. When they arrived, Mason acted as a lookout while the three men went into Koster's home. When the three men came back, one of them gave Mason a rifle. Mason testified that they did not have the weapon when they initially got out of the car, but they had it when they returned.

¶5. When the Tippah County Sheriff's Department arrived on the scene, officers discovered both Koster and Hopper dead from multiple gunshot wounds. When Investigator Jeremy Rainey later listened to the 911 dispatch call, he remembered Koster was a confidential informant for Tennessee authorities in a federal investigation of a man named Keith Hamer, who was suspected of trafficking methamphetamine across state lines.

¶6. Keith had at least one other person working with him—his son Nakero Hamer. Nakero was seventeen years old and was a "runner" for Keith. A customer would place an

2

order to Keith's phone, and Keith would call Nakero and tell him to deliver the drugs.

¶7.	During Koster's and Hopper's murders, Keith was in federal custody in Oxford, Mississippi, for drug trafficking. Koster happened to be one of Keith's biggest customers. After recalling that Koster was a confidential informant, Investigator Rainey was put in touch with Special Agents Scott Lawson and Wes Mayes of the FBI. Agents Lawson and Mayes drove to Koster's house the morning that the murders occurred. After listening to the 911 recording and hearing the shooters identify themselves as the FBI, they went to visit Keith the following day. The agents believed there was a connection between the FBI's investigation of Keith and the murders of Koster and Hopper. Only a few people knew Koster was in contact with the FBI—one of whom was Nakero Hamer. Keith told the investigators he was not involved in the murders and did not think that his son was involved either. As proof, Keith agreed to call Nakero to show that neither he nor his son had anything to do with the deaths of Koster and Hopper.

¶8.	Nakero initially denied having anything to do with the crimes. However, on the recorded call he confessed that he did it because he thought Koster had gotten his father Keith arrested. During the phone call, Nakero said, "I did it. I changed the wheels on them tires." Keith asked Nakero if he left any loose ends, and Nakero said he had not. Sighing, Keith told Nakero he would call him back.

¶9.	After the first phone call, Agent Lawson testified that Keith began to weep. Keith then made a second phone call to Nakero. Keith asked Nakero, "Why the hell would you do that anyway, man, why?" Nakero replied, "He had something to do with you." Keith then

3

said of Koster, "That was a good dude, man." Keith proceeded to ask Nakero, "Why wouldn't you think the cameras got you on camera?" Nakero replied, "You can't see my face. Mask on—no face, no case."

¶10. A warrant was then issued for seventeen-year-old Nakero, and he was arrested.

## COURSE OF PROCEEDINGS

¶11. Nakero was indicted for two counts of capital murder for the killing of Koster and Hopper and theft of the rifle.

¶12. Investigator Rainey testified he interviewed Nakero after his arrest. "[Nakero's] demeanor was relaxed," he recalled, and the teenager "didn't seem to have no worries." During the interview, the 911 recording was played for Nakero, and once the suspect had listened to it, he commented on how he had been off his medications. Nakero also stated that one time, he was playing football and broke another player's leg, and he stood over the person and laughed.

¶13. Investigators also played recordings of phone calls between Nakero and his father Keith. When asked if there was a change in his demeanor after the recordings were played, one investigator testified that Nakero ducked his head down and put his hands over his head. At that point, the interview with Nakero ended. Investigator Rainey stated that after the interview had ended, Nakero told him and the other investigator that they might want to look at T.J. Hamer and Terrenz Mason—the other men who went to Koster's house that night.

¶14. FBI Agent Lawson testified about the investigation of Keith and the wiretapped phone calls between Keith and Nakero. Agent Lawson testified that they monitored Keith's cell

4

phone calls, and they learned that Keith was "at the top" of the drug trafficking and that Paul Koster was one of Keith's biggest customers.

¶15.    As a result of the wiretap, the FBI was able to determine Nakero was involved in Keith's drug enterprise. When asked how much of the information relating to the wiretapped phone calls connected Keith, Nakero, and Koster, Agent Lawson testified that "just about all of our intel at that point came from listening to the [wiretapped] telephone calls." Agent Lawson was asked if he was able to recognize Nakero's voice on the phone calls, and he answered yes. In short, Agent Lawson was able to match the voices as being from the same two people—Keith and his son Nakero.

¶16.    Dr. Mark LeVaughn, the State's chief medical examiner, testified about the autopsy findings on Paul Koster and Ayla Hopper. According to Dr. LeVaughn, the autopsies revealed Koster sustained ten gunshot wounds on various locations on his body, and the cause of death was multiple gunshot wounds due to homicide. Hopper sustained thirteen gunshot wounds on various locations of her body, including injuries to major organs—the brain, the left lung, the heart, the right lung, and the liver. The results of these injuries were hemorrhage. There were also wounds to the head, the chest, the abdomen, one arm, and both legs. Hopper's cause of death was multiple gunshot wounds, and the manner of death was homicide.

¶17.    The jury found Nakero guilty of two counts of capital murder.

¶18.    At sentencing, Investigator Rainey believed Nakero could not be rehabilitated. In contrast, two of Nakero's brothers and Nakero's aunt testified they believed he was a normal

seventeen-year-old boy and believed he could be rehabilitated.

¶19.    Nakero was sentenced to life imprisonment without the possibility of parole for both counts.  Nakero appealed, raising seven issues.  For the sake of clarity, we combine some of his assignments of error.

## DISCUSSION

### I.    The wiretapped phone calls were admissible to establish Nakero's motive.

¶20.    At trial, the circuit court allowed the admission of wiretapped phone calls between Nakero and his father Keith.  On appeal, Nakero argues this audio was more prejudicial than probative, and as a result the jury should not have been allowed to hear them.  Nakero goes on to argue that even assuming that the audio was not more prejudicial than probative, there was no reason to inject this information throughout the trial.

¶21.    "Evidence admissibility is reviewed under an abuse of discretion standard."  *Phillips v. State*, 285 So. 3d 685, 691 (¶19) (Miss. Ct. App. 2019).  "Reversal is required only if the defendant can show that he was prejudiced or harmed by the exclusion of the evidence."  *Id*.  "A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence."  *Shell-Blackwell v. State*, 305 So. 3d 1211, 1219 (¶23) (Miss. Ct. App. 2020).  "Where error involves the admission or exclusion of evidence, [the reviewing court] will not reverse unless the error adversely affects a substantial right of a party."  *Id*.

¶22.    Mississippi Rule of Evidence 404(b)(1) provides, "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  This evidence, though, "may

6

be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." MRE 404(b)(2). "Additionally, if the evidence meets one of these exceptions, it must be filtered through Rule 403." *Shell-Blackwell*, 305 So. 3d at 1219 (¶24). Under our Rules of Evidence, a trial "court may exclude relevant evidence if its probative value is *substantially* outweighed by [the] danger of . . . unfair prejudice . . . ." MRE 403 (emphasis added). "If the evidence is determined to be more probative than prejudicial, it may be admitted, with the trial court's giving an instruction to the jury explaining the limited purposes for which the evidence may be considered." *Shell-Blackwell*, 305 So. 3d at 1219 (¶24).

¶23. "Generally, evidence of a crime other than that charged in the indictment is not admissible evidence against the accused." *Duplantis v. State*, 644 So. 2d 1235, 1246 (Miss. 1994). "However, where another crime or act is so interrelated to the charged crime as to constitute a single transaction or occurrence or a closely related series of transactions or occurrences, proof of the other crime or act is admissible." *Id*. Evidence of other crimes or bad acts is also admissible "in order to tell a rational and coherent story of what happened and where it is substantially necessary to present a complete story." *Jones v. State*, 913 So. 2d 436, 439 (¶8) (Miss. Ct. App. 2005).

¶24. Nakero argues that the FBI wiretap phone calls and testimony by the Special Agents were irrelevant and severely prejudicial. The State argues that the trial court properly admitted the eight wiretapped phone calls as proof of motive under Rule 404(b)(2). The State stresses the phone calls also established that Nakero was a runner for his father's drug

7

business, that Koster was known to buy drugs from Keith, that Nakero sometimes delivered those drugs to Koster's house, and that Nakero knew where Koster lived and knew his way around Koster's house. Finally, the State argues that the phone calls establishing Nakero's drug-related activities were necessary to prove that Nakero had reason to believe Koster was the reason the FBI arrested his father—giving Nakero motive to murder Koster. In a pretrial ruling, the trial court held that the tapes were admissible because "there's no way to try this case without talking about drugs and drug sales."

¶25. In a similar case, a man sold methadone and morphine to a confidential informant. *Palmer v. State*, 939 So. 2d 792, 794 (¶2) (Miss. 2006). Before trial, the defendant moved to exclude testimony that he sold drugs. *Id*. at (¶3). The trial court held a hearing on the motion and denied it. *Id*. At trial, testimony was offered regarding previous drug sales between the defendant and another person. *Id*. at (¶4). Palmer appealed, arguing that the trial court abused its discretion in denying his motion and allowing the testimony dealing with the prior bad acts. *Id*. at 795 (¶8).

¶26. The Supreme Court held that "the State has a 'legitimate interest in telling a rational and coherent story of what happened.'" *Id*. at (¶9) (quoting to *Brown v. State*, 483 So. 2d 328, 330 (Miss. 1986)). "Where substantially necessary to present to the jury the complete story of the crime, evidence or testimony may be given even though it may reveal or suggest other crimes." *Id*. (internal quotation marks omitted). The Court allowed the testimony of the previous sales since it fulfilled "the purposes of proving intent [and] motive and . . . completing the story of the charged crime." *Id*. at (¶10). "Even though the testimony passed

8

muster under Miss. R. Evid. 404(b) it still must be admissible under the ultimate filter of Miss. R. Evid. 403, meaning that the risk of undue prejudice cannot substantially outweigh the probative value." *Id*. The *Palmer* court found that the trial court weighed the probative value of the evidence against the potential for undue prejudice and found that the trial court did not err in denying Palmer's motion in limine. *Id*. at (¶11).

¶27.    Like *Palmer*, evidence of the wiretapped phone calls in this trial was not offered to show Nakero's character. Even though the wiretapped phone calls revealed evidence of Nakero's involvement in Keith's drug business, the evidence was "substantially necessary to present to the jury 'the complete story of the crime.'" *Id*. at (¶9). The evidence of his involvement in the large drug operation was presented as an integral part of the story for the purpose of establishing that Nakero had the motive to kill Koster since he believed Koster was collaborating with the FBI agent that arrested his father. Therefore, we cannot say the trial court abused its discretion in admitting the evidence.

¶28.    Additionally, "[u]pon admitting the evidence under M.R.E. 404(b), the Court must still consider the admission of the evidence in connection with M.R.E. 403." *Jones v. State*, 962 So. 2d 1263, 1269 (¶22) (Miss. 2007). "M.R.E. 403 provides for the exclusion of evidence, even if it is relevant, where the risk of undue prejudice would outweigh the evidence's probative value." *Id*. During the pretrial hearing, the trial court further determined the probative value of the recorded phone calls related to the drug sales outweighed their prejudicial effect because "there's no way to separate the drug business from the murder investigation." The State argued to the trial court that without the phone

9

calls, there would be no connection between Nakero and Koster before the murder occurred; therefore, the phone calls were necessary to establish that Nakero knew Koster personally and also to prove that Nakero had reason to believe Koster was the reason the FBI arrested his father, giving him the motive to murder Koster.

¶29. Ultimately, the testimony and recorded calls were admissible as proof of motive and to tell "the complete story" to the jury. Furthermore, the prejudicial effect of the phone calls and testimony did not substantially outweigh its probative value. Accordingly, we find it was not an abuse of discretion to admit this evidence.

## II. Sufficient evidence supported the underlying felony of armed robbery for Nakero's capital murder convictions.

¶30. Nakero argues on appeal that there was insufficient evidence to support the underlying felony of armed robbery for his capital murder convictions.[1]

¶31. "In reviewing the sufficiency of the evidence on appeal, we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Johnson v. State*, 310 So. 3d 328, 331 (¶13) (Miss. Ct. App. 2021) (internal quotation mark omitted). "We are not required to decide—and in fact

_____

[1] The State correctly points out that in the header of Nakero's argument he submits an alternative argument that the convictions of capital murder were against the overwhelming weight of the evidence. However, Nakero fails to include any proposed argument or caselaw in the body of his argument to support this position. Mississippi Rule of Appellate Procedure 28(a)(7) states that an appellant brief "shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on." *Lewis v. State*, 295 So. 3d 521, 538 (¶55) (Miss. Ct. App. 2019). Because Nakero's argument regarding the weight of the evidence does not comply with Rule 28(a)(7), it is procedurally barred. *Hill v. State*, 215 So. 3d 518, 523-24 (¶10) (Miss. Ct. App. 2017). Therefore, we will only address the sufficiency-of-the-evidence issue here.

10

we must refrain from deciding—whether we think the State proved the elements; rather, we must decide whether a reasonable juror could rationally say that the State did." *Id*. Therefore, we must determine whether a reasonable juror could rationally find that Nakero committed the elements of capital murder with the underlying felony of armed robbery.

¶32.   Mississippi law defines capital murder as "the killing of a human being without the authority of law by any means or in any manner shall be murder when done with or without any design to effect death, by any person engaged in the commission of the crime of robbery." *Batiste v. State*, 121 So. 3d 808, 831 (¶33) (Miss. 2013) (quoting Miss. Code Ann. § 97-3-19(2)(e)).

¶33.   The essential elements of armed robbery are "(1) a felonious taking or attempt to take; (2) from the person or from the presence; (3) the personal property of another; (4) against his will; (5) by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon." *Waldrop v. State*, 247 So. 3d 364, 366 (¶7) (Miss. Ct. App. 2018).

¶34.   Applicable to this case, "Mississippi follows the 'one-continuous-transaction' rule for determining whether the evidence establishes the requisite nexus between the killing and the underlying felony to constitute capital murder." *Batiste*, 121 So. 3d at 831 (¶33). "Where the two crimes (e.g., murder and robbery) are connected in a chain of events and occur as part of the res gestae, the crime of capital murder is sustained." *Id*. at 831-32 (¶33). "The State need not prove the defendant had the intent to rob prior to the killing." *Id*. "Rather, the State has the burden to prove that the two crimes are connected in a chain of events and occur as

11

part of the res gestae." *Id*. (internal quotation marks omitted).

¶35.     Nakero argues there was no evidence that he and the other men planned or intended to rob Koster before going to his house.  However, as set out in *Batiste*, the State was not required to prove Nakero intended to rob Koster prior to the killing.

¶36.     Nakero further argues that the State failed to prove he aided and abetted the other men in the robbery.  Yet "it is well established that any person who is present at the commission of a criminal offense and aids, counsels, or encourages another in the commission of that offense is an 'aider and abettor' and is equally guilty with the principal offender." *Sneed v. State*, 31 So. 3d 33, 41 (¶24) (Miss. Ct. App. 2009).  The jury heard testimony that once the three men returned from the house where Koster and Hopper were murdered, they returned with a rifle taken from the home.  This evidence was sufficient under *Sneed* to support the conviction.

¶37.     According to Mason's  testimony and the 911 recording, there was evidence that Nakero was present at the time of the murders and robbery.  Mason stated that the three men brought a rifle back to the car that they did not initially have when they got out of the car.  There was also testimony that since Nakero would sometimes deliver drugs to Koster, he knew where Koster lived and knew his way around his house.  The jury heard a recorded call where Nakero admitted to his father that he committed the crimes he was charged with by stating, "I did it. I changed the wheels on them tires."  The jury also heard in the same recording Nakero say, "Mask on—no face, no case," which—viewing the evidence in the light most favorable to the State—indicates that he had committed the crimes in Koster's

12

house but hoped his concealed identity would thwart his prosecution.

¶38.   The separate opinion contends that "the evidence at trial did not prove that *any* items were taken from Koster's home." However, there are two key pieces of evidence the jury heard regarding armed robbery.

¶39.   First, the jury heard from star witness Terrenz Mason—the lookout who stayed in the car while the trio went into the Koster residence on the night of the murders. Mason testified on direct examination that once the three men got back into the car, they had a rifle they did not have when they initially invaded the Koster home. When asked if he was given anything when the men returned, Mason testified, "Yeah."

[The State:]   Did they give you something at some point?

[Mason:]   Yeah.

Q.   What did they give you?

A.   A rifle.

Q.   Did they have the rifle when they got out?

A.   Naw.

Q.   But they had it when they got back in?

A.   Yeah.

¶40.   Second, the jury listened to the 911 call Koster had placed. After he and Hopper were murdered, the 911 call kept recording, capturing one of the intruders in Koster's house saying, "I don't see no more guns."

¶41.   As set out above, our standard of review requires that we "view the evidence in the

13

light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Johnson*, 310 So. 3d at 331 (¶13).  Given these two critical pieces of evidence introduced during the trial, we hold that a rational juror could have found Hamer guilty of each element of armed robbery.

¶42.    Pursuant to our standard of review, we find there was sufficient evidence for a reasonable jury to find Nakero guilty of capital murder with the underlying felony of armed robbery.

### III.    The state's closing argument was not an impermissible Golden Rule argument.

¶43.    Nakero objected during the State's closing argument because it allegedly used an improper "golden rule" argument.  The trial court did not rule on Nakero's objection.

¶44.    "'Golden rule' arguments, which ask the jury to put themselves in the place of one of the parties, are prohibited." *Batiste*, 121 So. 3d at 863 (¶145).  "The reason behind such a prohibition is the premise that a person should not be the judge of his own case." *McCoy v. State*, 147 So. 3d 333, 344 (¶26) (Miss. 2014).  "On the other hand, it is well-settled that attorneys are granted wide latitude in making opening and closing statements." *Id*.  "The trial court is provided considerable discretion in determining whether a particular remark is so prejudicial that a mistrial should be declared." *Id.*  "When such a statement is sufficiently insignificant in the overall context of the case, the result is harmless error." *Id.*  (internal quotation marks omitted).  "This Court previously has determined that the use of a golden-rule argument is reversible error." *Holliman v. State*, 79 So. 3d 496, 500 (¶19) (Miss. 2011).

14

¶45.    In its closing, the State argued:

> You know, you listen to these [recorded] calls they had been listening to for 28 days and you hear the interaction between Keith Hamer and Nakero Hamer, and you think this is going on in your homes, near your homes. But that's [what] was going on. Sometimes the truth is hard to take. But that's what the relationship is.

¶46.    This language did not ask the jurors to put themselves in the victims' place to determine Nakero's guilt.  By simply mentioning "you think this is going on in your homes, near your homes," the prosecutor did not ask the members of the jury to place themselves in the position of the victims under the specific circumstances of the crime.  *See, e.g.*, *Holliman v. State*, 79 So. 3d 496, 499-500 (¶16) (Miss. 2011) (finding that a prosecutor committed reversible error in a murder trial by asking jurors how they would feel if he walked into the courtroom and pointed a loaded shotgun at them).[2]  Rather, the State's comment shows that the wiretapped phone calls established how Nakero was involved in his father's drug business.  We find this was not an impermissible Golden Rule argument.

---

[2] In some fashion the language the State used was closer to a "send-a-message" argument than a "Golden Rule."  Both are prohibited.  *See Miskell v. State*, 270 So. 3d 23, 35 (¶43) (Miss. Ct. App. 2018) ("Our supreme court has repeatedly condemned the 'send a message' argument and warned prosecutors accordingly").  Just as the closing argument did not trip the safeguard against a Golden Rule argument, it also does not violate the ban on a "send the message" argument.

While the State's comment "you think this is going on in your homes, near your homes" does give rise to the question of whether it constitutes an improper send-a-message argument, the comment is "dubitable at best."  *See O'Connor v. State*, 120 So. 3d 390, 399 (¶22) (Miss. 2013).  In this case, after considering the evidence, testimony, and the context in which the alleged improper comments were made, the State's comment is not so inappropriate that it "prejudicially affected the accused's rights."  *Jackson v. State*, 174 So. 3d 232, 238 (¶17) (Miss. 2015).

**IV.    We decline to review Nakero's ineffective-assistance-of-counsel claim.**

¶47.    Nakero argues that his defense counsel was ineffective for failing to present mitigation evidence at his *Miller*[3] sentencing hearing.[4]

¶48.    Ineffective-assistance-of-counsel claims should ordinarily be raised in a petition for post-conviction relief, not on direct appeal. *Hamlin v. State*, 306 So. 3d 843, 844 (¶2) (Miss. Ct. App. 2020).  "The Court will address such claims on direct appeal when (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate, and the appellate court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed." *Id.*

¶49.    Nakero argues that "[t]here were no details about [his] upbringing or mental health problems growing up although counsel was aware of the fact these avenues needed to be investigated given [his] testimony at the competency hearing." Nakero further contends that the jury was given little evidence regarding the various *Miller* factors.

¶50.    However, the State does not stipulate that the record is adequate to consider the

_____

[3] *Miller v. Alabama*, 567 U.S. 460 (2012).

[4] Counsel for Nakero also argues in the alternative that the trial court erred when it denied his motion for a continuance so that defense counsel could prepare for the hearing. Counsel goes on to say that "[i]t may well have been because his lawyer, hired a month prior to the trial, did not have sufficient time [to prepare]."  However, Nakero fails to include any proposed argument or caselaw in his argument to support this position. Mississippi Rule of Appellate Procedure 28(a)(7) requires that an appellant brief "shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on."  Because Nakero's argument does not comply with Rule 28(a)(7), it is procedurally barred. *Hill*, 215 So. 3d at 523-24 (¶10).  Therefore we will only address the ineffective-assistance-of-counsel issue here.

ineffective-assistance claim. The record shows that the bulk of Nakero's arguments are not based on the trial record. Rather, Nakero's arguments are based on things that *could* have been in the record. It is well established that "[t]his Court will not consider matters that do not appear in the record, and it must confine its review to what appears in the record." *Pulphus v. State*, 782 So. 2d 1220, 1224 (¶15) (Miss. 2001).

¶51. Because the record does not affirmatively show either ineffective assistance of counsel rising to the level of a constitutional violation, and because the parties did not stipulate that the record is adequate to determine whether Nakero received ineffective assistance from his trial attorney, we decline to review Nakero's claim and it may be raised in a motion for post-conviction relief, with the Supreme Court's permission. *See* Miss. Code Ann. § 99-39-7 (Rev. 2020) (requiring motion seeking PCR to be filed in the Supreme Court "[w]here the conviction and sentence have been affirmed on appeal").

## V. The rules of evidence do not apply at sentencing hearings.

¶52. Nakero protests that during sentencing Investigator Rainey was allowed to provide unqualified expert testimony on whether he could be rehabilitated. While there was no objection at trial to this testimony, Nakero now claims it prejudiced him because the investigator was not properly admitted under MRE 702. However, "the Rules of Evidence do not apply in sentencing hearings." *Collins v. State*, 232 So. 3d 739, 747 (¶34) (Miss. Ct. App. 2017); *see also* MRE 1101(b)(4).

## VI. The jury was properly instructed on the *Miller* factors.

¶53. Nakero next argues that the sentencing jury instructions, which require a jury to

unanimously agree beyond a reasonable doubt that Nakero should be sentenced to life with parole or life without parole eligibility, do not correspond with the precedent that life without parole should be reserved for only the rarest of juvenile murder cases.[5] *Miller v. Alabama*, 567 U.S. 460, 476 (2012). Nakero further asserts that to comport with *Miller*, the federal constitution requires sentencing authorities to make an affirmative and on the record finding of permanent incorrigibility before imposing a life-without-parole sentence on a juvenile.

¶54. At sentencing, Nakero failed to make the objections he now asserts on appeal. "Our Supreme Court has repeatedly held that an offended party's failure to object to jury instructions at trial procedurally bars the issue on appeal." *Jones v. State*, 238 So. 3d 1235, 1239 (¶10) (Miss. Ct. App. 2016) (internal quotation marks omitted). Therefore, this issue is procedurally barred.

¶55. Notwithstanding the procedural bar, Nakero's sentencing jury instructions comport with *Miller*. "The Court has already ruled that a separate factual finding of permanent incorrigibility is not required." *Jones v. Mississippi*, 141 S. Ct. 1307, 1313 (2021).[6] And

---

[5] In Nakero's brief, issues six and seven present the same legal argument. For clarity, we will address the issues together.

[6] In his brief, Nakero argues that we should adopt the approach of Oklahoma, which previously required that a juvenile defendant be irreparably corrupt and permanently incorrigible before sentencing the juvenile to life imprisonment with or without the possibility of parole. *See Luna v. State*, 387 P.3d 956, 963 (¶21) (Okla. Crim. App. 2016) (negative history omitted).

However, the Oklahoma Court of Criminal Appeals recently overruled that line of cases: "In light of [the U.S. Supreme Court's ruling in] *Jones*, the State no longer has the burden under the federal constitution of proving a juvenile defendant is irreparably corrupt and permanently incorrigible beyond a reasonable doubt." *White v. State*, 499 P.3d 762, 769 (¶16) (Okla. Crim. App. 2021).

"the Court has unequivocally stated that a separate factual finding of permanent incorrigibility is not required before a sentencer imposes a life-without-parole sentence on a murderer under 18." *Id*. at 1318-19. As a result, Nakero's final issue is without merit.

**CONCLUSION**

¶56. We find that the wiretapped phone calls were admissible to establish Nakero's motive and that sufficient evidence existed to establish the underlying felony of armed robbery in Nakero's capital murder convictions. We also find that the State's closing argument was not an impermissible golden-rule argument and that Nakero's ineffective-assistance-of-counsel claim is not appropriately brought on direct appeal. Further we find that Investigator Rainey gave proper lay witness testimony and that the jury was properly instructed on the *Miller* factors. For these reasons, we affirm.

¶57. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY McDONALD, J.**

**WESTBROOKS, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶58. I concur with the majority on Parts I, III, IV, V, and VI. I dissent from the majority on Part II pertaining to Nakero's challenge to the sufficiency of the evidence because contrary to what the majority opines, no "juror could rationally say that the State" proved the elements of the crime charged beyond a reasonable doubt. *Ante* at ¶31 (quoting *Johnson v. State*, 310 So. 3d 328, 331 (¶13) (Miss. Ct. App. 2021)).

¶59. On July 5, 2017, in the middle of the night, Nakero, Kaderius, T.J., and Mason rode

around in "Nunu" Hamer's car. They were "just chilling" as usual and "wanted to go smoke a couple of blunts." They stopped at a gas station on Highway 72 for Kaderius to get out of the car and retrieve a 9-millimeter Smith & Wesson from Justin Martin. They then drove to Paul Koster's home. Everyone got out of the car except for Mason. The three teenagers, Nakero, Kaderius, and T.J., walked up to Koster's house and within minutes shot and killed Koster, along with Alya Hopper. Koster had security cameras around his home. At 2:46 a.m., Koster dialed 911 and connected with the dispatcher. He told the 911 operator, "I'm scared as hell," and he said it "looks like they got an assault rifle."[7] Koster heard the three boys announce themselves as FBI agents, and because Koster was a federal witness for the FBI, he answered the front door. Shots were fired immediately. The 911 dispatcher was still on the line. Voices could be heard saying, "[W]e were on camera" and "got to go." The call ended. Mason said that he saw the boys coming to the car with a rifle—one he had not seen before.

¶60. Based on these facts, the State charged the defendant Nakero with capital murder while in the commission of committing armed robbery.[8] Indeed, the State chose to charge capital murder, which left the jury with only two options: (1) find Nakero guilty of both murder and armed robbery or (2) find Nakero not guilty.

---

[7] Neither the State nor Nakero mentions this statement, and it is not in the transcript. It can be heard on the 911 call, entered as Exhibit 1, at 55 seconds.

[8] It is written in Count I and Count II of the indictment that the State charged Nakero Hamer with violating "Section 97-3-19(2)(e) of the Mississippi Code of 1972, Annotated . . . ." Another indictment charged Nakero with "taking possession of a .17 HMR caliber rifle that was taken out of Paul Koster's residence."

**STANDARD OF REVIEW**

¶61. We review the sufficiency of the evidence "in the light most favorable to the prosecution." *Parish v. State*, 176 So. 3d 781, 785 (¶13) (Miss. 2015). Even so, we still must review all the evidence—not just the evidence that supports the State's case. *Fisher v. State*, 481 So. 2d 203, 212 (Miss. 1985), *overruled on other grounds by Nevels v. State*, 325 So. 3d 627, 630-31 (¶¶11, 20) (Miss. 2021). The State provides insufficient evidence "if the facts and inferences, properly considered, point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty." *Id*. If the State does not prove each element of each offense beyond a reasonable doubt, this Court may reverse. *See Poole v. State*, 46 So. 3d 290, 294 (¶20) (Miss. 2010).

**ANALYSIS**

¶62. For this Court to affirm this capital-murder conviction, *see* Miss. Code Ann. § 97-3-19(2)(e) (Supp. 2015), the conviction must be "supported by evidence legally sufficient to support a conviction of both the murder and the underlying felony had either been charged alone." *Fisher*, 481 So. 2d at 212. Meaning, the State needed to prove beyond a reasonable doubt that Nakero committed both murder and armed robbery to sustain a conviction. Proof beyond a reasonable doubt means that the evidence must be sufficient to establish the defendant's guilt. *Ware v. State*, 301 So. 3d 605, 612 (¶24) (Miss. 2020). The evidence must rise above mere suspicion. *See Wooldridge v. State*, 274 So. 2d 131, 133 (Miss. 1973); Stanford Young, *Trial Handbook for Mississippi Lawyers* § 9:11 (3d ed.) (updated Oct.

2021). Further, when the State attempts to prove guilt through circumstantial evidence, "the evidence must be sufficient to prove guilt beyond a reasonable doubt . . . ." *Goff v. State*, 14 So. 3d 625, 647 (¶75) (Miss. Ct. App. 2009); *see Nevels*, 325 So. 3d at 634 (¶20); *cf. Billiot v. State*, 454 So. 2d 445, 461 (Miss. 1984); *Bates v. State*, 952 So. 2d 320, 325 (¶20) (Miss. Ct. App. 2007).

¶63. Capital murder is defined under section 97-3-19(2)(e) as "[t]he killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of . . . robbery . . . ."

¶64. Robbery while using a deadly weapon, i.e. "armed robbery," is defined as follows:

> [A] person who shall feloniously take or attempt to take from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon . . . .

Miss. Code Ann. § 97-3-79 (Rev. 2014).

¶65. I believe the State provided sufficient evidence of murder. However, I believe the State failed to present sufficient evidence of the underlying armed robbery. Nakero asserts that "the [S]tate [failed] to prove that the taking of the rifle was not merely an afterthought committed by Kaderius alone." While I agree that the State did not provide sufficient evidence of the armed robbery, it is not for the reasoning that Nakero purports. I believe the evidence at trial did not prove that *any* items were taken from Koster's home.

¶66. The third element of robbery is the "taking and carrying away the property of another from his person or in his presence." *Christian v. State*, 207 So. 3d 1207, 1215 (¶34) (Miss.

22

2016); *Goff*, 14 So. 3d at 647 (¶78) (Miss. 2009); *Walker v. State*, 913 So. 2d 198, 223 (¶78) (Miss. 2005). The State alleged that Nakero committed armed robbery when he took items[9] from Koster's home. Yet the record does not reflect that a "taking and carrying away" of property ever occurred. When Koster was on the phone with the 911 operator, he stated it "looks like they got an assault rifle," but, the State did not later present any evidence that there were two rifles—a rifle that Nakero already possessed when approaching the house and a rifle taken from Koster's home.

¶67.    While the majority contends that there are "two key pieces of evidence" that the State presented to the jury (a voice saying, "I don't see no more guns," and Mason's response, "Naw," to the question "Did they have the rifle when they got out?"), these statements are not sufficient to conclude that the boys "[took] and [carried] away the property of [Koster]." *See Christian*, 207 So. 3d at 1215 (¶34). There is an issue of fact regarding when the boys allegedly took the rifle. Mason did not testify to seeing the boys bring a rifle from Koster's home. Mason instead testified that he received a rifle at a later time:

> Q.    Okay. When they got back into the car - - when they got back into the car, did anybody give you anything?
>
> A.    No, not when they got in the car.
>
> Q.    Did they give you something at some point?
>
> A.    Yeah.

[9] The State asserted in its opening statement that "after the murder, items belonging to Paul Koster were taken from the house." The singular rifle, marked for identification as Exhibit 19, was the only item the State presented as stolen. Then in closing arguments the State said, "[W]hen they came back out of that house, they had some stuff they didn't have . . . a long black rifle . . . . It was taken from the house of Paul Koster."

23

This testimony does not support Mason's noticing a rifle being carried by Hamer from Koster's home. Thus, a conviction for capital murder based on armed robbery cannot stand here. The majority has no answer to Koster's 911 statement, "[L]ooks like they got an assault rifle." Instead, the majority invokes the standard of review, explaining that we must "view the evidence in the light most favorable to the State." Although this is our standard of review, the law also requires that we consider *all* the evidence, including Koster's statement. *See Fisher*, 481 So. 2d at 212; *accord Nevels*, 325 So. 3d at 634 (¶20) ("They [(i.e., the jurors)] should consider and weigh *all* of the evidence presented.").

¶68. Our appellate courts have previously overturned a jury's verdict when the evidence presented was insufficient to sustain the verdict. *See Sands v. State*, 62 So. 3d 374, 378 (¶¶19-20) (Miss. 2011) (finding the evidence insufficient when there was no evidence that Sands pointed the gun at the victim or fired a shot); *Dean v. State*, 295 So. 3d 575, 578 (¶10) (Miss. Ct. App. 2020) (finding the State's evidence insufficient to sustain a burglary conviction when it did not show the condition of the home at the time of the alleged burglary for the jury to determine if the home was broken into). Likewise, here, we should overturn the jury's underlying armed robbery conviction because the State's evidence did not show that any of the three boys, Nakero, T.J., or Kaderius, took and carried away a rifle or a second rifle from Koster's home; that any of the boys physically picked up a gun from Koster's home; or that Koster possessed any rifles at his home prior to the boys' entry for the jury to find that the rifle was stolen. Absent from the record is any physical evidence, by fingerprint, DNA, or otherwise, showing that the rifle Mason saw was the same rifle from Koster's home.

24

Also absent from the record is any witness' testimony that Koster ever possessed a rifle or that a rifle was ever registered to Koster.

¶69.    Given this lack of evidence, no rational juror could conclude that the State proved all the elements of the underlying armed robbery offense beyond a reasonable doubt.  We should reverse and render the capital murder conviction and remand for sentencing for first-degree murder under Mississippi Code Annotated section 97-3-19(1)(a).

**McDONALD, J., JOINS THIS OPINION IN PART.**